ESTATE OF RUBY S. STURGIS, DECEASED, FIRST COMMERCIAL BANK EXECUTOR, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Sturgis v. Commissioner
Docket No. 12219-85.
United States Tax Court
T.C. Memo 1987-415; 1987 Tax Ct. Memo LEXIS 412; 54 T.C.M. (CCH) 221; T.C.M. (RIA) 87415; August 24, 1987. Byron M. Eiseman, Jr., James E. Harris, and Louis H. Mathis, for the petitioner. Robert J. Shilliday, Jr., for the respondent. PARR
MEMORANDUM FINDINGS OF FACT AND OPINION PARR, Judge: Respondent determined *413 a deficiency in petitioner's estate tax in the amount of $ 4,106,548.23. The issues for decision are (1) whether respondent's expert [1] correctly valued certain timberlands owned by Ruby S. Sturgis ("decedent") at her death and (2) whether petitioner may claim as a deduction from the gross estate certain interest expenses under section 2053. [2] For convenience, our findings of fact and opinion are combined. Decedent died testate on June 26, 1981. Her will named the Commercial National Bank of Little Rock ("CNB") as executor. On July 31, 1983 CNB was merged into First Commercial Bank, N.A., of Little Rock ("FCB"). FCB presently acts as executor of decedent's estate. FCB has its principal office in Little Rock, Ark. CNB timely filed an Estate Tax Return for petitioner on March 26, 1982. In accordance with an election of CNB, the section 2032 [3] alternate valuation date was used in valuing decedent's gross estate. *414 Valuation Issue
Among the assets in decedent's estate are parcels of land located in Lincoln, Cleveland, Dallas, Clark, and Hot Springs Counties, Ark. (the "Sturgis property"). The Sturgis property totals 11,298.86 acres in size. There are 96 separate tracts, if they are counted by separate legal description. If tracts which share a common border or corner are consolidated, there are 85 tracts. [4] The first issue is the value of the Sturgis property. On the estate tax return petitioner claimed a value of $ 5,129,554.88, as of December 26, 1981, the alternative valuation date. Respondent determined in his statutory notice that the value as of that date was $ 10,400,000, but now concedes that the value on December 26, 1981 did not exceed $ 10,226,000. Valuation has been consistently recognized as an inherently imprecise process and usually, *415 in the final analysis, it necessarily involves a "Solomon-like pronouncement." See . A determination of the value of property is essentially a question of fact. . Section 20.2031-1(b), Estate Tax Regs., provides that if the executor elects the section 2032 alternate valuation date, property includable in a decedent's gross estate is to be included at its fair market value as of that date. Fair market value is measured by what a willing buyer would pay a willing seller when neither is under any compulsion and both are reasonably informed as to all relevant facts. Section 20.2031-1(b), Estate Tax Regs. Petitioner has the burden of proving that respondent's determination of the fair market value of the property, as modified by respondent's concession, is incorrect. ; Rule 142(a). It is well settled that the fair market value of property "should reflect the highest and best use to which such property could be put on the date of valuation." . *416 See also . Here, the parties agree that the highest and best use of the Sturgis property is as timberland. Each expert valued the property by a standard methodology. [5] First, the volume of timber on the property was determined. This is most commonly and accurately done by means of a timber "cruise." [6] Then, for each type of wood cruised, a unit value is determined as of a given valuation date. [7] The value per unit is multiplied by the number of units on the property. Finally, the land is valued as a separate component without regard to the growing timber. [8]
*417 Petitioner offered the opinions of valuation experts from three firms: Anthony Timberlands, Inc. ("ATI"), Ray Camp, Inc. ("Camp"), and Barnes, Quinn, Flake and Anderson, Inc. ("BQFA"). Respondent offered the opinion of one timberland valuation expert, James B. Morrison ("Morrison"). We will discuss the experts together under headings corresponding to the elements of their valuations. Timber Volume
Generally
The volume of timber in a tree is a function of several factors. One is its "diameter breast high" or DBH. This is the diameter of a tree as determined by a tape placed around its circumference at a point approximately 4-1/2 feet from the ground. DBH classes run in even numbers of inches, e.g., 8, 10, or 12 inches DBH. A tree's height is measured in "logs". A tree 16 feet high will yield one log. A tree 24 feet high will yield 1-1/2 logs, etc. The height of a tree may be determined by an experienced eye, and checked through use of a clinometer, or "Abney level." A forester ordinarily performs a timber cruise by noting on tally sheets while in the field the number of trees in his sample of a given diameter, height, and wood type. Standards of merchantability, *418 however, may vary among foresters and affect the results of a cruise. [9]
For example, trees on stands with densities of less than 1,000 board feet ("1 MBF") might be deemed unmerchantable, as might timber on stands which have severe brush or drainage problems. Trees under 6 inches DBH are generally deemed young growth, not merchantable timber, and "old field pine" is less valuable than other pine. [10]
Further complicating matters is that different foresters may use different diameters as the cutoff between more valuable saw timber and less valuable pulpwood. Moreover, foresters may differ in the extent to and manner in which they adjust appraisals made years *419 after the valuation date for growth, decay, and harvesting. The volumes determined by the appraisers who cruised the property [11] are as follows: ATI
Camp
Morrison
Pine saw logs
21,581,094 BF
15,517,562 BF   22,906,000 BF
Hardwood saw logs (all)
4,295,507 BF
--
4,921,000 BF
Oak saw logs
--
1,553,135 BF   --
Misc. hardwood saw logs
--
217,018 BF   --
Mixed hardwood saw logs
--
710,439 BF   --
Pine pulpwood
27,524 CD
17,857 CD   29,600 CD
Hardwood pulpwood
32,973 CD
33,353.28 CD
43,400 CD
ATI
In August of 1981, shortly after decedent's death, petitioner engaged ATI to assist in management of the Sturgis property. During *420 September, October, and November of 1981, ATI performed a variable plot prism cruise of the property. [12]
ATI performed the Sturgis cruise for estate tax valuation purposes, to generate information necessary to properly manage the property, and to provide a basis for future borrowings. Because its cruise was done close to the valuation date, ATI did not need to account for growth or harvesting in subsequent years. ATI put all trees in the 10-inch DBH class in the category of pulpwood, and all trees 12 inches DBH and over were categorized as saw timber. For purposes of obtaining a Federal Land Bank ("FLB") loan, however, ATI categorized 10-inch trees as saw timber, in accord with FLB regulations. ATI included old field pine in its tally and mapped the Sturgis property so as to indicate where old field pine was present. ATI did not classify old field pine differently than other pine in its cruise.
Camp
Camp was specially engaged by petitioner to cruise and value the Sturgis property. Ray Camp and Dave *421 Reinold performed a 5 percent cruise of the property in January 1984. [13] Camp did not count all the trees, but only those deemed "merchantable." [14]
Camp adjusted his values for harvesting and the two growth seasons between the December 1981 valuation date and the January 1984 cruise date. Camp added to his volume figures amounts harvested as determined with reference to historical cutting records on a tract by tract basis. Camp did not have full access to all such records, however, and therefore relied on the ATI cruise for volumes on tracts 1, 2, 5, 9, 10, 78, 81, 94, and 95. [15]
Camp deducted from his volume figures amounts by which the trees had grown, as determined with reference to a scientific "growth study." [16] Camp chose this method over discounting by predetermined average growth figures because *422 averages are not as accurate where, as here, younger trees grow faster than older ones. Despite his rejection of averages because of inaccuracy, however, Camp did not allocate the growth thus determined in accord with the actual growth of the trees, but allocated the total tree growth only to faster growing young trees. [17] It appears that this assumption was favorable to petitioner, because it minimized reductions on more valuable large trees. [18]
Camp's tally sheets show that 10-inch pine was most often categorized as saw timber, but not consistently. [19] Hardwood was treated by Camp as pulp up to 12 inches DBH, with only occasional deviations. [20] Camp did not count old field pine in its *423 tally. BQFA
BQFA did not cruise the property. The one of its valuations which required a cruise relied on the Camp cruise for volume and value figures. [21]
Morrison
Morrison is intimately familiar with timberland valuation in and around south central Arkansas where the Sturgis property is located. He performed a 1 percent cruise of the Sturgis property during June, July, and September of 1983. [22]
Morrison adjusted his sample volume for growth occurring after June 26, 1981. [23] He made detailed observations of the growth *424 patterns in the area and determined that the Sturgis land growth rate for pine timber was 6 percent a year while that for hardwood timber was 5 percent a year. These discounts were applied to the cruised volumes. Morrison also added back the volume of timber cut from the tract between June 26, 1981, and September 16, 1983. This volume was taken from the Schedule of Capital Gain and Loss filed with the estate fiduciary's income tax return. This cut timber was adjusted for growth in the same manner as the growing timber. Morrison uniformly classified 10-inch trees as saw timber. He counted old field pine in his tally but included it as pulpwood only. Morrison did not present a separate determination of the amount of old field pine on the Sturgis property.
Conclusions
Ideally we only would value the stands of timber likely to be bought. Camp's cruise attempted to isolate those stands. However, we are not persuaded Camp included these stands and only these stands. Nowhere does Camp specifically state what standards it used to deem timber *425 "merchantable." [24] Moreover, the unexplained symmetry of the Camp and ATI cruises is disturbing. We must therefore, reject the Camp cruise. After a review of the timber cruises, we adopt the ATI cruise figures as the most thorough and reliable. [25] ATI's 16 point per 40 acre cruise is more thorough and therefore more likely to be accurate than Morrison's two point per 40 acre cruise. Moreover, ATI's cruise was performed much nearer in time to the valuation date than the others, eliminating any potential for inaccuracy due to intervening growth seasons or harvesting. Finally ATI performed its cruise for three separate reasons, enhancing its credibility. [26] We now therefore consider the appropriate value to be assigned ATI's volumes. *426 Timber Value
The experts who independently valued the timber did so as follows: Wood Type
ATI
Camp
Morrison
Pine saw logs
$ 150/MBF
$ 193.37/MBF
$ 210/MBF
Hardwood saw logs (all)
40/MBF
--
65/MBF
Oak saw logs
--
57.71/MBF
--
Misc. hardwood saw logs
--
37.20/MBF
--
Mixed hardwood saw logs
--
44.28/MBF
--
Pine pulpwood
10/CD 12.90/CD 15/CD Hardwood pulpwood
1/CD 3.15/CD 4/CD ATI
ATI justified its values by asserting that the region in which most of the Sturgis property is located has poor timber quality. Difficulty in marketing the Sturgis timber was said to have been likely because the industry in late 1981 was at a low point and because there are only two pine plants in the area. [27]
Further depreciating the timber value in ATI's opinion was that the land has scant stands of pine saw logs and those present were of marginal size and quality. Moreover, pine pulp was termed "skimpy" and hardwood saw logs were said not to stand in merchantable quantities. With these and other unappealing specifications, the *427 timber would have to be sold at bargain prices to entice a buyer to come and cut it, ATI believed. [28] ATI discussed no specific comparable properties or timber sales in appraising the value of the Sturgis timber. Camp
Likewise, Camp discussed no specific comparable properties or timber sales in its appraisal of the value of the Sturgis timber. The Camp report states generally that "stumpage" values were studied and timber buyers and sellers contacted. Camp set up two-function tables [29] in which timber values varied with both timber quality and the accessibility of the tract on which it was located. [30] Factors such as size, grade, and volume per acre were considered when Camp decided in which quality class the timber on a given tract would be placed. *428 According to Camp, the pine saw logs on the Sturgis land generally were of poor quality and the hardwood worse. Sixty to sixty-five percent of the timber volume on the Sturgis property was found in trees 16 inches DBH and below. Ray Camp thought the best timber had already been cut [31] and little money put back into the land to make it productive. Brush was noted on Camp's tally cards for 28 tracts totalling 3,302.53 acres. Brush and poor drainage present logging obstacles, and may be further disincentives to a timber purchaser. Despite these criticisms, Camp's figures were far closer to Morrison's than to ATI's. This was explained by the fact that Camp only valued his "merchantable" quantities. It may be assumed that stands of timber susceptible to the above criticisms were excluded from the cruise altogether. [32]
Morrison
Contrary to ATI, Morrison identified 11 or more mills within hauling distance of the Sturgis *429 property, owned by at least six different timber users. This, he thought, enhanced the Sturgis timber value. Moreover, Morrison attempted to defuse Camp's testimony about timber quality, stating that timber is usually bought as the "woods run," i.e., all sizes and grades on a given tract. He also did not think prices were at a low point at the valuation date. Although he acknowledged a decline in pine saw log prices for several years before the valuation date, he observed market stability through 1981 and a further decline after the valuation date. Although pine pulpwood prices did increase during 1982, hardwood prices were generally stable through 1981 and 1982, Morrison stated. With these market conditions in mind, Morrison determined timber value first by examining actual purchases of timber by mills in the market area from May 1, 1981 to October 1982. Several of these sales were actual sales of timber from the land at issue here. In May 1981, the International Paper Company ("IP") bought all the pine saw timber 18 inches DBH and larger which it could cut during the contract term from one parcel of the Sturgis property. The price was $ 286/MBF. Other pine saw log sales, *430 which apparently included some "salvage timber," where made from the Sturgis property in October 1982 for prices of $ 180 and $ 195/MBF. Hardwood saw timber from the subject tracts was sold in 1981 and 1982 for $ 65/MBF. Sturgis pine plupwood sold in those years for $ 15 CD and Sturgis hardwood pulpwood for $ 4/CD. The Arkansas Forest Commission ("AFC") sold timber from the area in which the Sturgis property is located on the following dates for the following prices: [33]
Date
Price
Pine Saw Timber
Hardwood Saw Timber
Oct. 15, 1981
$ 229
$ 65
Nov. 10, 1981
208
65
Jan. 7, 1982
230
65
Jan. 26, 1982
212
65
Feb. 10, 1982
222
65
Mar. 11, 1982
202
65
May 4, 1982
198
65
*431 Miscellaneous 1981 sales in Lincoln, Cleveland, and Bradley Countries [34] were examined by Morrison. They reflect prices for pine saw timber of $ 225-$ 280/MBF, for hardwood saw timber of $ 80/MBF, for pine pulpwood of $ 20/CD and for hardwood pulpwood of $ 4/CD. With respect to the timber sold in these transactions, the Court was not apprised of the presence or absence of brush, drainage, density, or access problems nor of the quality of the timber involved. The only published price charts for standing timber are those put out by Timber Mart-South. [35] The charts list high, low, and average prices for different wood types grown in different areas and are published monthly. Morrison reviewed the December 1981 edition and checked the prices indicated for timber grown in the part of Arkansas in which the Sturgis property is situated (area "1"). [36] The average December 1981 price for pine saw timber in area 1 was $ 222/MBF. [37] Demand for such timber, however, was listed as poor both as of the time of publication *432 and for the next 30 days. Morrison thought the Sturgis pine saw timber was about average for the area, but that the hardwood saw logs, pine pulpwood,and hardwood pulpwood were all better than average and would compare favorably with timber selling at the high end of Timber Mart-South's prices for those types of wood. The prices are set out in the margin. [38]
*433 Morison summarized his data and determined values as follows: Pine Saw
Hardwood Saw
Pine
Hardwood
Timber
Timber
Pulpwood
Pulp
Sales from subject
286
65
15
4 AFC
216
65
--
--
Miscellaneous sales
243
80
20
4 Timber Mart-South
222
66
14
4 Morrison
210
65
15
4 Conclusions
We reject ATI's value as having an insufficient basis. Its cursory comments on the timber market and quality of the Sturgis timber stands clearly cannot form the predicate for an adequate appraisal. We also reject Camp's valuation for the simple reason that we do not know what was valued. Although ideally we would apply full value to those stands of timber that could be expected to sell, as discussed above the Camp appraisal cannot be relied on for guidance as to what timber would sell. We therefore decline to adopt Camp's value. We are left, therefore, with Morrison's values. They are good starting points for several reasons. First, Morrison based his determinations on actual sales, including several from the property itself. Moreover, he used a broader base of comparable sales and other indicia of value than did the other *434 experts. Although not controlling, we find it significant that in computing land values, two of petitioner's experts deducted from known sales prices pine saw timber values based on prices of $ 210/MBF and $ 220/MBF. See notes 42 and 45. Moreover, in discussing timber industry trends, petitioner's third expert, BQFA, stated that high quality accessible pine saw logs were worth $ 175-225/MBF in December 1981. Petitioner has persuaded us, however, that the Sturgis timber should not be valued precisely at Morrison's levels, and that some should be accorded no value at all. Some 2,711.82 acres, or approximately 24 percent of the Sturgis property contained pine saw timber densities of less than 1 MBF/acre, according to the ATI cruise. [39] With December 1981 demand for timber being poor, we think it unlikely that these stands would attract any buyers at that time. Therefore, no value should be ascribed to the pine saw timber growing on those tracts. [40]
*435 We next note that the 1981-1982 selling prices for Sturgis pine saw timber were mostly in the $ 180-195/MBF range. In the only transaction for which there is a contract in the record the selling price was $ 286/MBF. This sale involved only trees 18 inches and over, however, and we think a significant reduction is warranted for Sturgis timber bought as the woods run. We find convincing evidence of this in the prices of the AFC sales. They took place at prices ranging from $ 198-230/MBF for pine saw timber, yet a far greater percentage of the AFC timber volume than the Sturgis timber volume was in trees 18 inches DBH and above. The IP contract shows that this size is desirable, and in a poor market, this would render significant parts of the Sturgis property less desirable. Also, ATI tallied old field pine as it did all other pine, and there was significant testimony that the quality of the Sturgis timber was poor. Morrison stated it was average. We need not resolve the conflict, however, because in a buyer's market it must be assumed that the relatively few sales that were being made involved better than average timber. For the foregoing reasons, we find that the December *436 1981 fair market value of the Sturgis timber, except that which should be accorded no value, is as follows: Pine Saw Logs
Hardwood Saw Logs
Pine Pulp
Hardwood Pulp
$ 190/MBF
65/MBF
15/CD
4/CD
Land Value
The experts valued the land as follows: ATI
Camp
BQFA
Morrison
$ 125/acre
$ 268.32/acre
$ 226.17 acre
$ 400/acre
ATI
ATI's land valuation was the most superficial. It was based on poor boundary lines which might need resurveying at up to $ 25/acre, the lack of valuable young growth and the need for about $ 100/acre in silvicultural costs. Mr. Givens of ATI also examined the "Ferguson Ranch" in setting a land value. [41] Givens deducted $ 243/acre for timber [42] from the $ 400/acre selling price of the tract to get a $ 157/acre land price. Givens viewed the Ferguson Ranch as more favorable in several respects than the Sturgis property, however, including location, accessibility, and propinquity to other land owned by the buyer. He also thought that before being equated with the December 1981 land value of the Sturgis property, the Ferguson land value should be discounted for falling timber prices *437 from early 1980 to December 1981. [43] He thus gave the Sturgis land a December 1981 value of $ 125/acre. Camp
Camp approached the land valuation by setting up "classes" of differing land quality, [44] assigning each a value and then placing each Sturgis tract in one of the classes. The class values were based on the sales of six properties deemed comparable. *438 Respondent's expert generally concurred in the reasonableness of Camp's allocations to the land components in those six transactions. The land values ranged from $ 323.99/acre to $ 630/acre. [45]
Camp would adjust downward any Sturgis land value figure based on the six comparables because the largest of them was 140 acres and the next largest 60 acres. Camp posited fewer buyers in the market for large tracts, driving down their prices. To support this theory Camp offered the examples of four tracts ranging in size from 1,069.53 acres to 20,000 acres. Their prices were $ 135/acre and $ 478.51/acre for land with respect to the tracts that had separate land and timber price components and $ 200/acre and $ 400/acre in total for those tracts that did not. Camp thought a further *439 adjustment necessary to account for what he called "cure-to-sell" costs. They were defined as the costs to attain a productive state for timberland. [46] Finally, Camp valued pine reproduction at an average of $ 26.12/acre. [47]
BQFA
BQFA used a class-based land valuation approach similar to Camp's. Seven land quality classes were defined, [48] with values assigned to each. Each of the Sturgis tracts was then classified. [49]
*440 The classes were assigned values $ 25 increments from $ 175-$ 300/acre. They were valued with reference to 13 actual timberland sales [50] during 1980-1983 in the area in which the Sturgis property is located. To determine in which class a tract should be placed, BQFA studied the Sturgis tracts thoroughly for accessibility, shape, topography, soil data, and timber data. Nine of the thirteen sales took place approximately within a year of the valuation date. Of those, five involved land located in a county in which some of the Sturgis property is located. Morrison challenged BQFA's values for those properties. The following chart illustrates, for each of those five sales, the sale date, acreage, county, and land value as determined by both BQFA and Morrison: Land Value/Acre
Number
Date
Acreage
County
BQFA
Morrison
5
11/25/80
742.46
Lincoln
370
400
6
12/23/80
120
Lincoln
385
427.50
7
5/11/81
66
Lincoln
276.39
430
8
12/9/81
296
Lincoln
325
395
11
10/5/82
845
Cleveland
322
351
*441 In numbers 5 and 7 both experts' land values were derived by deducting timber value from sales price. Whereas Morrison's timber value was made with reference to an actual timber cruise done by his associate, however, BQFA's apparently was based on an approximation by the buyer. In number 6 the land value was determined the same way and whereas Morrison estimated that no merchantable timber existed on the tract, BQFA estimated some. The bases for both these estimates was an interview with a representative of the buyer. In number 8, based on a discussion with a real estate specialist for the buyer, Potlatch Forest, Inc., Morrison discounted the $ 400/acre selling price for only $ 5/acre worth of timber because there was little timber on this open pastureland. BQFA discounted more. In number 11, the buyer had obtained a $ 30/acre price reduction on the land and timber which Morrison prorated according to their relative values. BQFA allocated more of the reduction to land than Morrison.
Morrison
In his own report, Morrison valued the land with reference to actual sales of the Sturgis property, other sales of similar land by the Sturgis family, and comparable sales of *442 cutover tracts or tracts with only minimal amounts of timber or young growth. The only actual sales of Sturgis land are of little guidance because of their unique circumstances. On October 7, 1982, petitioner sold a 1-1/2 acre right-of-way for about $ 2,089/acre. On April 25, 1980, the J. P. Sturgis Trust sold Lincoln County swampland to the Arkansas Game and Fish Commission for use as a lake. The price was $ 550/acre. Eight sales of cutover timberland, or land with minimal amounts of timber were also reviewed by Morrison. Six of these both took place within a year of the valuation date and involved land in a county in which some of the Sturgis property is located. These six sales are shown below, with a comparison between Morrison's price and that of BQFA. Number
Date
Acreage
County
Land Value/Acre
Morrison
BQFA
3
11/25/80
742
Lincoln
400
370
4
4/14/81
42.5
Dallas
425
*
5
6/8/81
40
Clark
475
387.50
6
6/10/81
20
Dallas
350
**
7
10/13/81
50
Dallas
340
260
8
12/9/81
296
Lincoln
370
325
*443 Of the sales for which BQFA posited alternative figures, numbers 3 and 8 were discussed above in the context of BQFA's report. For number 5, Bragg adjusted Morrison's stated purchase price from $ 575 to $ 562.50, the figure that appears on the deed. He then gave the timber a value of $ 175/acre in accord with an interview of a representative of the purchaser. This was then deducted from the $ 575/acre purchase price. For number 7, the purchaser gave Bragg an estimate of $ 100/acre timber value which Bragg deducted from the $ 360/acre purchase price. Morrison valued young growth at $ 75/acre where it existed in sufficient numbers to establish a new stand of trees. Because he estimated that only 1/3 of the acreage carried such volume, Morrison added to the land value an average of $ 25/acre for premerchantable timber. No objective support was offered for this value.
Conclusions
ATI's cursory assessment of land values compared to others in this record compels us to reject its position out of hand. Likewise, Morrison did not thoroughly investigate and report on the specific attributes of the individual Sturgis tracts. Only Camp and BQFA attempted to value each tract *444 individually. We find this to be the more precise method. Camp deducted "cure-to-sell" costs from his land value, yet there was testimony that buyers do not deduct anticipated cure-to-sell costs from their price. Moreover, Camp's comments on the individual Sturgis tracts were brief. Clearly the most thorough analysis of the land was done by BQFA. It analyzed soil data, site index, accessibility, drainage, and other factors for each site. The grounds it used to discriminate quality levels in its classes are reasonable. The values assigned to those classes, however, are out of line even with the land values Camp itself assigned to parcels it selected as comparable. This, four of the five BQFA comparables listed above were assigned land values by BQFA of over $ 322/acre. Yet BQFA's class (A)), to which would be assigned only the very best sites, was given a value would be assigned only the very best sites, was given a value by BQFA of $ 300/acre. BQFA's class (C), which was referred to as defining a "good" site, was given a value of $ 250/acre. If the Sturgis tracts were indeed comparable to those BQFA deemed comparable, the typical Sturgis tract that could be sold would sell *445 for over $ 322/acre. Therefore, while we accept BQFA's classification of the tracts, we think the per acre values of the classes should be increased by $ 75 each. There remains yet the question of whether a discount should be applied because of the volume of land involved here. Petitioner argues the discount should apply because the scant number of potential buyers for tracts of over 11,000 acres drives the price down. Respondent argues that the potential to acquire large amounts of nearby property should induce a buyer to pay a premium. Whether we adopt petitioner's theory, or the related notion that placing many similar units of property on the market at the same time devalues each, we agree that a "blockage" discount is applicable. Respondent's expert himself has acknowledged as much in another case involving other Sturgis Arkansas timberland. [51] We reject the novel suggestion that a premium would likely be earned on a sale by petitioner.
Using our best judgment, we think appropriate a discount of 20 percent to the total land value, determined in accord with our directions above. *446 Summary
The value of the Sturgis property is $ 7,136,718. This is computed as follows: Pine Saw
Hardwood Saw
Pine
Hardwood
Timber
Timber
Pulpwood
Pulp
ATI timber volumes
21,581,094   4,295,507   27,524   32,973   Less unmerchantable
timber
1,664,313   --   12,934   --   Net volumes
19,916,781   4,295,507   14,590   32,973   Values per unit
$ .19/BF
$ .065/BF
$ 15/CD
$ 4/CD
Values
$ 3,784,188   $  279,208   $ 218,850   $ 131,892   Total timber value $ 4,414,138
Class:
A
B
C
D
E
Land values per acre
$ 375
$ 350
$ 325
$ 300
$ 275
Total acres per class
246
849
2,442
4,473
2,608
Land values per class
$ 92,250
$ 297,150
$ 793,650
$ 1,341,900
717,200
20% blockage discount
18,450
59,430
158,730
268,380
143,400
Net values per class
$ 73,800
$ 237,720
$ 634,920
$ 1,073,520
$ 573,760
Total land value
$ 2,722,580
Total value (timber and land)
$ 7,136,718
Class:
F
G
Land values per acre
$ 250
$ 225
Total acres per class
440
227
Land values per class
$ 110,000
$ 51,075
20% blockage discount
22,000
10,215
Net values per class
$ 88,000
$ 40,860
*447 Interest Issue
In March 1983, petitioner secured a loan from the FLB to pay state and Federal death and estate taxes and interest. [52] The loan principal is not clearly established in the record, but it was at least $ 2,669,616.36. Substantially all the funds were used for their intended purpose. [53]
As of April 30, 1986, petitioner held liquid assets with a market value of $ 944,448.19. [54] The assets were held as a cushion for FLB payments, for administration expenses, and to cover contingencies, such as an increase in the estate tax as a result of the instant litigation. The FLB loan principal as of April 30, 1986 was $ 2,658,616.36 *448 In 1985, petitioner invited bids on the Sturgis property from several timber companies FCB thought would be interested. By the time the bids were due to be opened, not one had been received. Timber sales had been made over the years from the Sturgis property, but the income has not been sufficient to cover both FLB payments and beneficiaries' requirements. [55]
During the course of the estate administration respondent has allowed petitioner paid the FLB $ 333,127.95. Respondent has challenged petitioner's attempt to deduct $ 322,823.07 of this amount. [56]
Respondent argues that petitioner has not proven that the *449 amount of the loan was necessary for the estate administration. He further argues that the debt could have been retired with estate assets and that the estate has been kept open "much longer than necessary thereby rendering the loans and interest payments made during the excess period also unnecessary." Since our precedents have examined the necessity of an administration expense in connection with its deductibility, respondent continues, we would disallow those unnecessary interest expenses. Petitioner looks to the language of section 2053, under which it claims here, and our precedents to conclude that its deduction is allowable. We agree. In a line of cases going back to 1937, this Court and its predecessor have recognized that interest payments on estate tax or on money borrowed to pay estate tax is deductible. See ; ; ; . Respondent attempts to bring this case, however, within the rule of . *450 In that case, the question was whether the allowability of an administration expense by the relevant state probate court is binding for Federal tax purposes. We agree with the Ninth Circuit that for Federal tax purposes, Federal courts must make a separate inquiry into deductibility. See (expense must also be shown to be actually and necessarily incurred). We think the facts here, however, are different from the facts that led the Hibernia Bank court to find the estate's interest payments unnecessary. In that case, all the specific bequests and claims had been paid out of the estate by December 1967. There were two main estate assets left: a mansion and 10,000 shares of the executor's stock. Rather than distribute the remaining assets, the executor attempted to sell the mansion, a feat not completed until 1972. There were, apparently, no affairs to be wound up or reasons for the estate to remain open, other than sale of the mansion. Between 1967 and 1972, upkeep on the property was roughly $ 60,000 a year. To pay for this upkeep, rather than sell some of its own stock, the executor bank borrowed $ 775,000, *451 more than 80 percent of which was lent by the executor bank to itself. Here we do not think the loan unnecessary, either when made or because the estate administration has been unduly prolonged. First, there is at least this very litigation which requires that the estate remain open. Second, the loan was reasonable when made. Even by respondent's own estimation, there was a shortfall of approximately $ 500,000 between estate tax liabilities and ready assets available to pay them. Respondent has not factored in state death taxes, however, nor the requirements of estate beneficiaries nor contingencies. Although the specific amounts of these actual and contingent liabilities are not known to the Court, we think they justify the borrowing. Although respondent has suggested the executors could have sold more land or timber, and that no contingency reserve is appropriate, we are not prepared to second guess the judgments of a fiduciary not shown to have acted other than in the best interests of the estate. In fact, our decision on the first issue has shown the fiduciaries to have been prudent indeed to have anticipated contingencies such as an increased estate tax liability. *452 In sum, we see no reason on the facts here to depart from our precedents. We hold for petitioner on this issue. To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. The valuation in the deficiency notice is higher than that in respondent's expert's report. Respondent has conceded the difference. ↩
2. These deductions arose after the deficiency notice was issued. Both parties addressed the issue at trial and on brief. ↩
3. All section references are to the Internal Revenue Code as amended and in effect on June 26, 1981. ↩
4. According to respondent's brief, however, there are 57 such tracts and according to one of his experts, there are 55 noncontiguous tracts. The figure in the text is derived from the Court's review of maps in evidence. ↩
5. Barnes, Quinn, Flake & Anderson ("BQFA"), one of petitioner's experts, also performed a second type of analysis in addition to the one described in the text. Since, by BQFA's own concession, this analysis was less thorough than its other analysis, we will analyze only the one described in the text. ↩
6. A cruise is a forestry term for a statistical sampling of the timber volume on a given tract. In a cruise, the volume of 100 percent of the trees in a sample is measured and this data is then projected over the entire tract. ↩
7. The wood at issue is usually classified for valuation as follows: (1) Pine saw logs, (2) hardwood saw logs, (3) pine pulpwood, and (4) hardwood pulpwood. ↩
8. Growing timber may be factored in the value of the land component of timberland in at least two situations. First, "premerchantable" young growth or "reproduction" may be included in the land value as an indicator of future timber value. Second, excessive brush may decrease the value of land because it hinders preparation of land for timber growth. ↩
9. Unmerchantable timber may be excluded from a cruise or may be included and considered as lowering the value of the timber cruised. ↩
10. Old field pine is pine which grows in loosely packed clusters on fields rather than in forests. Because of the lack of competition from neighboring trees, it grows faster in diameter than other pine. It is less valuable, however, because it also grows slower in height and contains more limbs. Tree limbs create knots in lumber, which can make it less suitable for many uses. ↩
11. Petitioner attempted to show at trial that Morrison could not have cruised the property in the stated time. We find that he did. Petitioner demonstrated that Morrison would have to have walked over 70 miles in 11 days, while performing all the duties incident to a proper cruise. We take judicial notice of the ability of a physically fit person to walk between 6 and 7 miles in only 2-3 hours. As discussed below, however, BQFA did not cruise the property. ↩
12. In such a cruise 16 points in each 40 acres of property are located along compass lines. All the trees are counted within a certain distance from each point. ↩
13. In their cruise, Camp and Reinold located 10 points per 40 acres, and counted the trees in a 1/5 mile plot around each point. ↩
14. The Camp report contains no definition of "merchantable." ↩
15. We note, however, that there was also perfect symmetry between the Camp and ATI cruises with respect to timber volumes on other tracts, including tracts 3, 4, 6, and 7. ↩
16. The growth study was done by extracting core samples from standing trees and measuring radial growth on stumps of trees. ↩
17. I.e., trees 16 DBH or less. ↩
18. Camp made an unfavorable assumption by counting dead trees as if they were alive in 1981. Ray Camp explained that such trees would not have totally decayed and disappeared if they first died in 1981. Under this justification, however, Camp need not have counted all the dead trees. Some may have been dead well before 1981. ↩
19. For example, the tally sheets for tracts 71 and 80 each show 10-inch trees tallied as both saw timber and pulpwood. It is not clear on what basis the distinction was made. ↩
20. For example, the tally sheet for tract 74 shows hardwood 14 inches DBH tallied as saw timber and pulpwood.↩
21. In this valuation analysis, BQFA independently determined land values and combined those values with the Camp timber values.↩
22. 1,122 particularly inaccessible acres were not viewed personally by Morrison, but only via aerial photographs. By reviewing the photos, he determined that these acres were similar to the tracts already sampled. ↩
23. In this regard, Morrison appears to have overlooked petitioner's election to value its assets as of December 26, 1981. ↩
24. It could be supposed that Camp excluded old field pine, timber growing in insufficient densities to be attractive to loggers, and timber growing on land with drainage and brush problems sufficient to discourage loggers. Supposition, however, is not the proper basis for accepting an expert's conclusions. ↩
25. We do not consider ATI's classification of 10-inch trees as pulp to be error, in light of the lack of consensus among the experts and the lack of evidence as to any industry standard. ↩
26. The three reasons would call for three separate and competing biases. Estate tax valuation would call for a downward bias, loan valuation would call for an upward bias, and valuation for ATI's own timber management purposes would call for no bias at all. ↩
27. Saw mills usually buy timber from within their "procurement area." ↩
28. Mr Givens testified that 20-25 percent of the pine on the property was old field pine. Even a cursory review of ATI's maps, however, shows that a far lesser percentage of the land on which pine was growing contained old field pine.↩
29. One of the tables follows: Pine Sawtimber:
Index Reads $/MBF
West Lands Area
Super Good
Good
Average
Low
Very Low
Access-Logging↩
Excellent
$ 275.00
$ 245.00
$ 210.00
$ 185.00
$ 135.00
Fair
240.00
220.00
190.00
145.00
110.00
Poor
210.00
190.00
165.00
120.00
90.00
30. Separate tables were made for pine saw timber (west lands area), pine saw timber (east lands area), "plantation" pulpwood, oak saw timber, other hardwood saw timber, and hardwood pulpwood. ↩
31. Camp determined that 13 tracts were cut so heavily that little, if any, merchantable timber remained. ↩
32. It also appears that Camp excluded saw timber and pulp growing in stands of densities less than 1 MBF/acre or 3 CD/acre, respectively.↩
33. Camp challenged Morrison's use of these sales as comparables because there was no inquiry as to the size of the trees involved. Our reivew of the bid specifications shows that at least as high a percentage of the AFC trees as the Sturgis trees were smaller than 18 iches DBH. It appears to be true, however, that a much higher percentage of the AFC volume↩ is derived from trees 18 inches DBH and over than is the case with the Sturgis timber. This feature makes the Sturgis timber less valuable. Camp also pointed out that the Sturgis timber is less valuable than that sold by FAC because the Sturgis land is less accessible in the winter months than that on which the AFC timber was grown. This restricts the time within which the timber can be cut. 34. Although none of the Sturgis property is located in Bradley county, that county is close to the subject property and therefore its timber was considered comparable. ↩
35. The publication relies on market data from foresters involved in marketing timber. ↩
36. Although Morrison used the area 1 figures, our own review of the evidence shows that much of the land may be in area 3. Because area 3 values are generally higher, however, petitioner is not prejudiced by any erroneous classification in this regard. ↩
37. The chart shows a price of $ 190/MBF "Scribner" scale. Morrison explained that when saw timber volumes are calculated on the "Doyle" scale, the price translates to $ 222/MBF. Prices and volumes used in this opinion, except where noted, are based on the Doyle scale. ↩
38. The following chart reflects the high, low, and average Timber Mart-South prices, and those Morrison thought appropriate. Morrison's prices are not his final prices, but those chosen solely with reference to the Timber Mart-South prices. Only after Morrison considered the specific actual sales of timber discussed above did he arrive at a final price. High
Low
Average
Morrison↩
Pine saw timber
278
187
222   222
Pine pulpwood
14
10 12   14
Hardwood saw timber
66
50
56   66
Hardwood pulpwood
4
2.50
3.50
4
39. This figure is computed tract by tract, over 96 separately defined tracts. Changing the definition of the tracts would change the volume per acre determination, but we do not agree with respondent that we should enlarge the tract size for purposes of this computation. Timber is bought on a tract-by-tract basis. ↩
40. The tracts on which the pine saw timber should be accorded no value are tracts 7, 8, 11, 13-15, 18, 19, 24, 39, 40, 41, 50, 80, 81, 85, 88, 89, 91, 93, and 95. The 1,644,313 board feet of pine saw timber on these tracts should be subtracted from the ATI volume figures. There are additional tracts which, according to the ATI cruise, have levels of pine pulp nder 3 CD/acre, said to be the minimum merchantable pine pulp under 3 CD/acre, said to be the minimum merchantable pine pulp density. We think that no value should be ascribed to the pine pulpwood growing on those tracts. They are tracts 1, 4, 5, 7, 8, 9, 12-14, 18-20, 22-25, 27, 28, 31, 33-44, 46-50, 53, 54, 58, 60, 63-65, 68-70, 72-75, 77-81, 84-87, 90-93, and 95. The 12,934 cords of pine pulpwood on these tracts should be subtracted from the ATI volume figures. ↩
41. Morrison thought the Ferguson Ranch so inferior as timberland to the Sturgis property that if the former were used to indicate value for the latter, the latter's value would be between $ 1,000 and $ 1,045/acre. Even petitioner's own expert, Ronald Bragg, of BQFA, viewed the Ferguson Ranch as not being physically comparable to the Sturgis property, but only probative on the point of whether a larger tract of land would sell for more or less per acre than a smaller one. ↩
42. Givens valued Ferguson Ranch pine logs at $ 210/MBF, hardwood logs at $ 40/MBF, pine pulpwood at $ 12/CD, and hardwood pulpwood at $ 1/CD. He applied these prices to early 1980 volume information to arrive at the timber value. ↩
43. Givens reasoned: "Land has got by some degree to be measured on the value of the product produced on it." ↩
44. There were five classes which differed on the basis of yield, accessibility, drainage, and location. ↩
45. Camp deducted timber values from known sales prices to obtain land values in several of the comparables. In the only two in which pine saw timber was listed as a separate component of timber value, Camp valued it at $ 220/MFB. He valued pine pulp in those comparables at $ 15/CD and $ 14/CD. ↩
46. At another point in his report Camp refers to "[c]osts to attain marketable condition." Other experts referred to these as silvicultural costs. ↩
47. Because the experts were not consistent as to whether this should be valued as part of the land component, we adopted the convention of so valuing it. We therefore added $ 26.12/acre to Camp's land value.↩
48. Classes were defined on the basis of accessibility, cost to replant or harvest (including access within the site, drainage, and brush problems), and site index. The site index of land is the number of feet which a tree growing on it will reach in a given number of years, usually 50 years. ↩
49. Contiguous tracts were consolidated, so that the entire Sturgis acreage was classified in only 55 tracts. ↩
50. One additional comparable BQFA studied was a listing, not a sale. It was deemed an ideal comparable, however, so its list price was considered, but only as a ceiling on fair market value. ↩
*. Ronald Bragg of BQFA testified that this was an intrafamilial sale and could not be used as evidence of an arm's-length price. ↩
**. Bragg testified that the acreage for this transaction was too small to be relevant to the Sturgis property. ↩
51. See . ↩
52. CNB requested and received for petitioner a hardship deferral of payment of a portion of the Federal estate tax under section 6161. ↩
53. So testified Leon Helms, FCB's trust officer in charge of petitioner. Since the exact amount of the loan is unknown, as is the amount of the Arkansas death taxes and interest, the exact amount borrowed and not used for the stated purposes is unknown. ↩
54. This is the value of Treasury notes and a money market fund as reported in petitioner's financial statement for the period ending April 30, 1986. The parties both offer different figures. ↩
55. Helms testified that although more timber could have been sold, it would not have been prudent to cut more. ↩
56. One of petitioner's financial statements states the loan will be amortized in 30 equal installments of $ 322,823.07 but that an interest payment of $ 333,127.95 was made on April 28, 1986. Another part states that principal of $ 15,320.35 and interest of $ 333,127.95 was paid on April 28, 1986. It is thus unclear why petitioner only argues for a deduction of $ 322,823.07, but its deduction will be limited in accordance with its argument. ↩