L & L MARINE SERVICE, INC. AND SUBSIDIARIES, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; ROBERT J. AND KATHERINE S. LESHE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
L & L Marine Service, Inc. v. Commissioner
Docket Nos. 25991-82; 25992-82.
United States Tax Court
T.C. Memo 1987-428; 1987 Tax Ct. Memo LEXIS 425; 54 T.C.M. (CCH) 312; T.C.M. (RIA) 87428; August 26, 1987. William J. Falk and Mary Helen Roth, for the petitioners. Steven W. LaBounty, for the respondent. KORNER
MEMORANDUM FINDINGS OF FACT AND OPINION Korner, Judge: In these consolidated cases, respondent determined deficiencies in and additions to petitioners' Federal income taxes as follows: L & L Marine Service, Inc. and Subsidiaries
Year
Addition to Tax
Ended
Deficiency
Sec. 6651(a) [1]
Sec. 6653(a)
June 30, 1977
[2] $ 5,729.77
$ 1,432.44
$ --
June 30, 1978
[2] 148,853.81
--
7,442.69
*428 Robert J. and Katherine S. Leshe
Addition to Tax
Year
Deficiency
Sec. 6651(a)
Sec. 6653(a)
1974
$ 12,679.00
$    --   $  --
1975
55,108.80
2,374.84
--
1976
37,633.84
--
--
1977
112,272.54
--
[3]  5,504.93
*429 After concessions, [4] the issues for decision with respect to L & L Marine Service, Inc. and Subsidiaries (the "L & L Group") are: (1) Whether amounts billed the L & L Group in its taxable year ended June 30, 1976, for work done on its barges represent capital expenditures or currently deductible expenses; (2) whether the salvage values of two towboats and an airplane owned by the L & L Group are less than the amounts determined by respondent; (3) whether the L & L Group is entitled to deduct depreciation on a number of automobiles it owned; (4) whether the L & L Group is entitled to deduct in its year ended June 30, 1978, its payment of part of its employees' Federal tax withholdings and part of its employees' share of FICA taxes; (5) whether the L & L Group is entitled to deduct as compensation expense withdrawals made by its stockholders; (6) whether the L & L Group is entitled to travel and entertainment expense deductions in excess of the amounts allowed by respondent; (7) whether part of the L & L Group's underpayment of tax of its tax year ended June 30, 1978, is due to negligence or an intentional disregard of rules and regulations. [4]
*430 After concessions, the issues for decision with respect to Robert J. and Katherine S. Leshe are: (1) Whether amounts withdrawn from the L &L Group by Robert J. Leshe were constructive dividends to him; (2) whether Robert J. Leshe received constructive dividends from the L & L Group when it paid certain of his travel and entertainment expenses; (3) whether Robert J. Leshe received constructive dividends from his personal use of cars owned by the L & L Group and from the Group's purchase of stock in an payment of dues charged by Fin and Fifty Investment Corp.; (4) whether part of the underpayment of the Leshe's taxes for 1977 is due to negligence or intentional disregard of rules and regulations. For convenience, after setting forth our general findings of fact, we will set forth separately specific facts and legal analysis relevant to each issue. GENERAL FINDINGS OF FACT These consolidated cases result from a series of determinations made by respondent with respect to Robert J. Leshe [5] ("Leshe") and the L & L Group, a consolidated group of corporations in which parent, L & L Marine Service, Inc., Leshe was a major shareholder. *431 The L & L Group's principal office was in St. Louis, Missouri, when it filed its petition in this case. It filed consolidated Federal income tax returns (Forms 1120) on which the following amounts of taxable income were reported: [6]
Taxable Year Ended June 30
Entity
1976
1977
1978
L & L Marine Service, Inc.
$ 135,424 $ 503,994 $ 1,304,927 General Marine Inc.
129,142 276,850 179,096 Inland River Transportation
Corp.
(511,562)
(742,589)
(772,371)
Weaver Shipyard & Drydock Inc.
300,714 (216,430)
(53,540)
Contratistas En Embarcaciones
de Puerto Rico
--    (73,210)
(69,787)
General Supply Company, Inc.
--    896 15,216 Marine Power Inc.
--    --    151,506 Less Eliminations
(232,000)
(12,895)
(9,012)
Income Before NOL
($ 178,282)
($ 263,384)
$ 746,035 Less NOL Deduction
--    --    (249,160)
Taxable
($ 178,282)
($ 263,384)
$ 496,875 *432 L & L Marine Service, Inc. ("L & L") is the parent of the L & L Group. During the years at issue, it owned 100 percent of the stock of General Marine Inc. ("General Marine"), Inland River Transportation Corp. ("Inland"), Weaver Shipyard & Drydock Inc. ("Weaver"), and Marine Power Inc.General Marine owned 100 percent of the stock of Contratistas En Embarcaciones de Puerto Rico. Leshe and George P. Jacobsen were the only shareholders of L & L. Their respective shareholdings were as follows: Percentage Ownership
Date
Leshe
Jacobson
June 30, 1976
90
10
June 30, 1977
50
50
June 30, 1978
50
50
Leshe was L & L's president, and Jacobson was L & L's vice-president. L & L, General Marine, and Inland had accumulated earnings and profits in approximately the following amounts on the dates indicated: Accumulated Earnings and Profits
Date
L & L
Inland
General Marine
June 30, 1976
$ 500,679
($ 596,000)
$ 1,206,350
June 30, 1977
1,191,861
(1,508,520)
1,468,829
June 30, 1978
1,833,133
(2,353,525)
1,806,003
Leshe and Katherine S. Leshe resided in St. Louis, Missouri, when they filed their petition in this case. *433 They timely filed joint Federal income tax returns for 1974, 1976, and 1977. They filed their joint Federal income tax return for 1975 on July 28, 1976. The due date of the return was July 12, 1976. The Leshes concede that their failure to timely file the return was not due to reasonable cause. Leshe organized the L & L Group in 1969. Its purpose was originally limited to operating tugs and barges on inland waterways of the United States. It later expanded the geographical scope of its operations and now operates tugs and barges all over the United States and throughout the Caribbean. CAPITAL EXPENSE ISSUE
FINDINGS OF FACT Prior to and during 1976, the L & L Group operated a fleet of barges. It used the barges in both fresh and salt water. The barges were used to transport, among other things, pitch, coke, carbon electrodes, fire brick, and soda ash. During its tax year ended June 30, 1976, the L & L Group had $ 1,313,451.07 of work performed on its barges. It deducted a total of $ 436,232.71 of the cost of the barge repairs including $ 371,261.32 from six barges referred to as P1 through P6. The year the L & L Group acquired barges P1 through P6, its costs, the *434 amounts of barge repair expenses claimed and the amounts capitalized for each for the year ended June 30, 1976, are set forth below: Year
Repairs
Amount
Barge
Acquired
Cost
Deducted
Capitalized
P1
1969
$ 93,151.27
$ 90,532.63 $ -0-   P2
1969
94,159.31
33,853.06 192,000.00
P3
1969
78,412,75
139,246.84 -0-   P4
1969
89,939.00
[7] (14,500.00)
-0-   P5
1969
88,766.10
121,043.82 -0-   P6
1969
94,906.02
1,084.97 -0-   $ 539,334.45
$ 371,261.32 $ 192,000.00
Each of the barges P1 through P6 had been fully depreciated by June 30, 1975. For the purpose of preparing a certified financial statement for the L & L Group's fiscal year ended June 30, 1977, the accounting firm of Peat, Marwick, Mitchell & Co. ("Peat Marwick") audited the books and records of the L & L Group. During the course of that audit, Peat Marwick determined that the Group was required to capitalize *435 $ 285,564.11 of the repair costs for barges P1 through P6 that it had expensed for the year ended June 30, 1976. [8] The L & L Group disputed Peat Marwick's deduction to capitalize the repair costs, but was forced to agree to capitalize the repairs in order to obtain financial statements certified by Peat Marwick. The Group needed the certified financial statements to show to lenders and could not afford the additional wait and expense that would be necessary to have an audit performed by another accounting firm. Peat Marwick refused to certify the statements unless the adjustment was made. Respondent audited the Group's consolidated corporate income tax return for the year ended June 30, 1976 and adopted Peat Marwick's treatment of the repair costs by determining that the Group's barge repair expense deduction must be reduced by $ 285,563.11. [9] Respondent determined that the $ 285,563.11 was a capital *436 expense within the meaning of section 263. Petitioners contend that the $ 285,563.11 is fully deductible as an ordinary and necessary business expense under section 162. [10]
*437 As a result of his determination that $ 285,563.11 of the Group's barge repair expense was a capital expense, respondent determined that the L & L Group's taxable income for 1976 should be increased by that amount, and that the amount of intercompany profits reported by the Group must be adjusted as follows: Year Ended
Adjustment
June 30, 1976
($ 83,635.10)
June 30, 1977
(7,631.43)
June 30, 1978
50,990.63 The $ 285,563.11 of barge repair expenses at issue was for ordinary and necessary repair and maintenance work, which neither enhanced the value of the barges, nor prolonged their useful lives. OPINION The issue for our decision is whether respondent erred in determining that $ 285,563.11 that the L & L Group expensed for the year ended June 30, 1976, for work done on its barges constituted capital expenses. Our determination of that issue will resolve whether respondent properly adjusted the Group's intercompany profits. Incidental repairs and maintenance expenses are deductible if they "neither materially add to the value of the property nor appreciably prolong its life, but keep it in an ordinarily efficient operating condition" provided the expense *438 is not added to the basis of the item repaired. Secs. 1.162-4, 1.263(a)-1(b), Income Tax Regs. Repairs in the nature of replacements are required to be capitalized to the extent that they both "arrest deterioration and appreciably prolong the life of the property." Sec. 1.162-4, Income Tax Regs. (Emphasis added.) The test to be applied in distinguishing between the two categories of repairs is "whether the expenditure materially enhances the value, use, life expectancy, strength, or capacity as compared with the status of the asset prior to the condition necessitating the expenditure." Plainfield-Union Water Co. v. Commissioner,39 T.C. 333, 338 (1962). Expenditures to replace worn-out parts of a large asset which were capitalized originally as part of the cost of the entire asset, are deductible when they are incurred merely to keep the asset in operating condition. Libby & Blouin, Ltd. v. Commissioner,4 B.T.A. 910, 914 (1926). It has been recognized that distinguishing between repairs that must be capitalized and repairs that are deductible currently often represents a question of considerable difficulty. P. Dougherty Co. v. Commissioner,159 F.2d 269, 272 (4th Cir. 1946), *439 affg. 5 T.C. 791 (1945), cert. denied 331 U.S. 838 (1947). In this case, Leshe testified at length regarding the damage caused to the barges by the punishing use to which they were put. He also described in detail the stringent standards the barges were required to meet in periodic tests in order to qualify to operate. His testimony was corroborated by Fontain M. Johnson, a professional engineer with a degree in Naval Architecture and Marine Engineering. Johnson was employed by the L & L Group during 1976 and is familiar with the Group's barge operation including the barges themselves, the types of cargo they carried, the conditions under which the barges were used, and the repairs and maintenance that had been performed on the barges. Leshe and Johnson agreed that the work performed on the barges was necessary to enable the barges to continue to qualify for sea duty, and that the repairs did not appreciably prolong their useful lives or enhance their value. We found their testimony in this regard to be credible. Respondent presented no expert testimony relevant to the repair expenses and instead appears to rely on the fact that the Group's accountants *440 required the expenses to be capitalized to support his position that expenses are not deductible. We have no evidence before us why the accountants required the expenses to be capitalized, and accept Leshe's explanation that financial exigencies forced the L & L Group to accede to the accountants' demands despite being convinced that the expenses were properly deductible. We conclude that the evidence establishes that the repair expenses at issue were incidental to the normal operation of the barges as they were incurred to replace worn out components and keep the barges in ordinarily efficient operating condition. They did not materially add to the value of the barges or prolong their lives as compared to the value and life expectancy of the barges prior to the use that necessitated the repairs. We accordingly hold that the $ 285,563.11 of repair costs are currently deductible as ordinary and necessary business expenses. SALVAGE VALUE
FACTS The L & L Group owned a number of towboats during the years at issue and used them to tow barges. The towboats included the Ocean Star and the Ocean Voyager. The Group also owned a Saberliner aircraft. The dates the Group acquired *441 the towboats and aircraft, its cost bases in them, their useful lives, and their salvage values as determined by respondent and claimed by the Group, are set forth below: Acquisition
Useful
Salvage Value Per
Asset
Date
Basis
Life
Respondent
L & L
Ocean Star
4/12/76
$ 2,941,245.41
20 yrs.
$ 600,000
$ 301,390.20
Ocean Voyager
6/11/76
2,956,804.80
20 yrs.
600,000
316,944.46
Saberliner
7/06/77
588,237.13
7 yrs.
350,000
58,876.53
When acquired, the Ocean Star had a salvage value of $ 301,390.20, and the Ocean Voyager had a salvage value of $ 316,944.46. OPINION The issue for decision is whether the two towboats and the Saberliner aircraft have lower salvage values than was determined by respondent. Respondent's determination decreases the L & L Group's allowable depreciation deductions during the years at issue. Salvage value is defined as: the amount (determined at the time of acquisition) which is estimated will be realizable upon sale or other disposition of an asset when it is no longer useful in the taxpayer's trade or business or in the production of his income and is to be retired from service by the taxpayer. *442 * * *
Sec. 1.167(a)-1(c)(1), Income Tax Regs. The same regulation provides further that: The time at which an asset is retired from service may vary according to the policy of the taxpayer. If the taxpayer's policy is to dispose of assets which are still in good operating condition, the salvage value may represent a relatively large proportion of the original basis of the asset. However, if the taxpayer customarily uses an asset until its inherent useful life has been substantially exhausted, salvage value may represent no more than junk value. * * *
See also Massey Motors, Inc. v. United States,346 U.S. 92, 107 (1960). The salvage value of an asset is a factual question, and petitioners have the burden of proving that the salvage values determined by respondent in his notice of deficiency are erroneous. S. & B. Realty Co. v. Commissioner,54 T.C. 863, 873 (1970). The evidence regarding the salvage values of the towboats consists of the trial testimony of Leshe and Fontain Johnson. Both testified to the effect that the salvage values determined by respondent for the towboats were too high. Leshe testified that he deliberately *443 selected salvage values for the towboats that were on the high end of the proper range in order to reduce the L & L Group's annual depreciation expenses. Johnson's testimony supports Leshe's testimony that the salvage values reported by the L & L Group were at least as great as was proper. Johnson testified that the salvage values reported by the Group were probably higher than appropriate. He explained that the salvage values of 20 year old towboats are equivalent to their scrap values and that the salvage values used by the Group were considerably higher than scrap values. [11] We found the testimony of both Leshe and Johnson to be credible in this regard. We consider both to be well qualified by training and experience to estimate the salvage value of vessels such as the towboats. We accordingly conclude that L & L has carried its burden of proving that respondent erred in determining the salvage value of the towboats, and hold that L & L has proven that the salvage values of the Ocean Star and the Ocean Voyager were no more than $ 301,390.20 and $ 316,944.46, respectively. We *444 hold, however, that L & L has failed to prove that respondent erred in determining the salvage value of the Saberliner. The only evidence in the record regarding the salvage value of the Saberliner is Leshe's testimony that he believes the salvage value reported by L & L is appropriate. Although we do not question Leshe's honesty, we simply accord his opinion little weight as he failed to demonstrate any experience that would qualify him to determine the Saberliner's salvage value. CORPORATE AUTOMOBILES
FACTS The L & L Group owned a number of automobiles during the years at issue. The months Group members acquired them, their cost bases, their salvage values, and their useful lives, are set forth below: Month
Cost
Salvage
Useful
Auto
Acquired
Basis
Value
Life
Owned by L & L
1973 Buick
[12] 9/73
$ 5,938.00
$ 1,000
3 yrs.
1976 Buick
3/76
7,599.00
1,600
3 yrs.
Owned by Inland
1973 Mercedes
8/73
$ 10,058.15
$ 4,000
3 yrs.
1975 Cadillac
9/74
9,401.61
3,700
3 yrs.
1976 Mercedes
7/76
23,726.08
9,500
3 yrs.
1978 Chrysler
6/78
8,739.83
3,500
3 yrs.
*445 If the L & L Group had used the automobiles exclusively for business, it would have been entitled to the following depreciation deductions during the years at issue: Year ended June 30
Automobile
1976
1977
1978
1973 Buick
$ 1,646.00
$ 269.00
$ --   1976 Buick
499.92
1,999.67
1,999.67
1973 Mercedes
2,019.38
336.61
--   1975 Cadillac
1,900.54
1,900.54
475.11
1976 Mercedes
--   4,742.03
4,742.03
1978 Chrysler
--   --   145.55
Total
$ 6,065.84
$ 9,247.85
$ 7,362.36
No records were kept of the business use of the automobiles. Petitioners and their children used the automobiles for personal purposes to some extent. In his notice of deficiency to the L & L Group, respondent disallowed all the depreciation deductions claimed during the years at issue for each of the six automobiles. Respondent based his determination that the L & L Group is not entitled to depreciation deductions for the automobiles on the grounds that they were not used for business purposes. [13]
*446 Respondent determined in his notice of deficiency to the Leshe's that they received the following constructive dividends from their personal use of the L & L Group's automobiles: Year
Automobile
1975
1976
1977
1973 Buick
$ 1,800
$ 450
$ --   1975 Cadillac
2,940
980
--   1976 Buick
2,760
2,760
1,150
Total
$ 7,500
$ 4,190
$ 1,150
OPINION
Depreciation Deduction
To establish that it is entitled to depreciation deductions for the six automobiles the L & L Group must prove that it used them, at least partially, for business. Sec. 167(a); Henry Schwartz Corp. v. Commissioner,60 T.C. 728, 744 (1973). Leshe testified at trial that the automobiles were used partially for business and partially for personal purposes. His testimony that the automobiles were used partially for business and partially for pleasure was forthright and unimpeached. We found it to be credible, and conclude accordingly that the L & L Group is entitled to depreciation deductions for the automobiles. Our inquiry does not end there, however. If an automobile is used partly for business purposes and partly for personal *447 purposes, as were the automobiles in issue, depreciation is deductible only to the extent of the business use. Henry Schwartz Corp. v. Commissioner, supra;International Artists, Ltd. v. Commissioner,55 T.C. 94, 105 (1970). The proportion of the use of the automobiles that is personal is a question of fact. International Artists, Ltd. v. Commissioner, supra at 104. Taxpayers who challenge respondent's determinations of their personal use of corporate property bear a heavy burden of proof because of the potential for abuse. International Artists, Ltd. v. Commissioner, supra at 108; Greenspon v. Commissioner,23 T.C. 138, 151 (1954), affd. on this issue 229 F.2d 947, 956 (5th Cir. 1956). Taxpayers such as petitioners who fail to keep adequate records should not be surprised if a court is reluctant to accept their testimony fully. Webb v. Commissioner,394 F.2d 366, 373 (5th Cir. 1968), affg. T.C. Memo. 1966-81. Leshe's testimony regarding the proportion of the automobiles' total use that was business use was imprecise. He testified that business use constituted *448 between 70 and 90 percent of the total use of each of the automobiles. He admitted that it was difficult for him to judge the proportion of business use of each of the cars, as he did not "follow around" their drivers. Although we are convinced that the automobiles were used for business purposes, we are unconvinced that Leshe's imprecise testimony establishes the amount of business use with reasonable accuracy. Where, as here, a taxpayer demonstrates that he is entitled to a deduction but is unable to establish the exact amount of the deduction, it is our responsibility to determine the appropriate amount of the deduction. Durkin v. Commissioner,87 T.C. 1329, 1397 (1986) (interpreting Cohan v. Commissioner,39 F.2d 540 (2d Cir. 1930)). In arriving at our determination we must weight our judgment heavily against the L & L Group as it failed to maintain records of the business use of the automobiles and is therefore responsible for the deficiency in the proof. Durkin v. Commissioner, supra.After carefully considering Leshe's testimony and the remainder of the record, we conclude that one-half of the total use of each automobile *449 constituted business use. We accordingly hold that the L & L Group is entitled to deduct one-half of the depreciation computed on each automobile.
Constructive Dividends
Taxable income includes dividends received by shareholders from corporations. Secs. 301(c)(1); 61(a)(7). When a shareholder of his family is permitted to use corporate property for personal purposes, the fair rental value of the property is includable in his income as a constructive dividend to the extent of the corporation's earnings and profits. Commissioner v. Riss,374 F.2d 161, 166-167, 170 (8th Cir. 1967), affg. on this issue a Memorandum Opinion of this Court; Falsetti v. Commissioner,85 T.C. 332, 356 (1985). Respondent determined that three automobiles owned by members of the L & L Group were used entirely for personal purposes, and that Leshe received constructive dividends from the personal use. [14] We have already concluded that only one-half of the use of the automobiles was personal. We accordingly hold that the Leshes received only one-half of the constructive dividends determined by respondent from their personal use of the automobiles. [15] We set forth *450 those amounts below: Year
Car
1975
1976
1977
1973 Buick
$ 900
$ 225
$ --
1975 Cadillac
1,470
490
--
1976 Buick
1,380
1,380
575
Totals $ 3,750
$ 2,095
$ 575
TAX PAYMENT DEDUCTIONS
FACTS Respondent audited the employment records of Inland for the calendar years 1973, 1974, and 1975. As a result of the audit, Inland *451 in its fiscal year 1978 was required to pay additional Federal withholding tax and Federal Insurance Contributions Act ("FICA") tax with respect to its employees as follows: Year
FICA
Withholding
Total
1973
$ 1,811.33
$ 837.69
$ 2,649.02
1974
4,674.27
2,433.70
7,107.97
1975
4,552.26
3,522.88
8,075.14
Total
$ 11,037.86
$ 6,794.27
$ 17,832.13
The following amounts of the taxes were paid on wages received by shareholders of L & L: FICA
FICA
Withholding
Withholding
Shareholder
Year
Wages
Tax
Wages
Tax
Leshe
1973
$ 0
$ 0
$ 1,589.50
$ 317.90
1974
0
0
1,677.89
335.58
1975
0
0
1,772.28
354.46
G. P. Jacobson
1973
0
0
1,733.08
346.62
1974
0
0
1,905.68
381.14
1975
0
0
2,105.68
421.14
Totals
$ 0
$ 0
$ 10,784.11
$ 2,156.84
The L & L Group claimed the $ 17,832.13 as an expense for its taxable year ended June 30, 1978. Respondent disallowed $ 12,313.20 of the deduction, representing the amount Inland paid for withholding of income tax and its employees' half of the FICA tax. Inland made no attempt to collect the disallowed amounts from its employees, and did not report *452 the amounts paid as compensation to its employees. It is not the policy of the L & L Group to pay its employees' regularly-accruing share of FICA or withholding tax. OPINION Petitioners content that the taxes at issue are deductible under section 162(a) as ordinary and necessary business expenses, either on the grounds that they were paid as compensation for services or, alternatively, on the grounds that they constituted a legal obligation of Inland under sections 3102(b) and 3403. [16] We agree with respondent that the taxes at issue are not deductible under section 162(a). To be deductible as compensation, an expense must be paid to purchase personal services. Sec. 1.162-7(a), Income Tax Regs. Amounts are not deductible as compensation if they are not paid to purchase services. Sec. 1.162-7(b)(1), Income Tax Regs. In this case, there is no evidence that the taxes at issue were paid by Inland to purchase the services of its employees. Indeed, as we have found, it was not the policy of the L & L Group to pay its employees' taxes as part of their compensation. The evidence establishes *453 instead that Inland paid the taxes to respondent in satisfaction of its legal obligation under sections 3102(b) and 3403. We accordingly conclude that the payments fail to qualify to be deducted as compensation expense. Having concluded that the payments are not deductible under section 162(a) as compensation expense, we must next address the L & L Group's argument that the payments are nevertheless deductible under section 162(a) as general business expenses. The Group argues that the taxes are deductible because Inland was obligated to pay them by sections 3102(b) and 3403. We disagree. A legal obligation to pay an expense does not, without more, make the expense deductible under section 162(a). Interstate Transit Lines v. Commissioner,319 U.S. 590, 594 (1943). To be deductible under section 162(a), an expense must also be both ordinary and necessary. Welch v. Helvering,290 U.S. 111, 113 (1933). In our view, the tax payments at issue were neither ordinary nor necessary expenses of Inland. The taxes at issue are imposed primarily on Inland's employees, not on Inland. Secs. 3102(a); 3402(a). Inland could have avoided the necessity of paying *454 them by simply withholding them as required. It only became obligated to pay the taxes after it failed to withhold them. [17] We accordingly hold that the taxes at issue are not deductible by the L & L Group under section 162(a). TRAVEL, ENTERTAINMENT, & GIFT EXPENSES
FACTS The L & L Group claimed deductions for travel, entertainment, and gift expenses for its taxable years 1976, 1977, and 1978. Respondent determined in his notice of deficiency to the L & L Group that it was not entitled to deduct a portion of the claimed expenses. Respondent based his determination on the grounds that (1) the Group had not established that the disallowed amounts were ordinary and necessary business expenses or were expended for the purpose designated, and (2) the Group failed to keep the records required by section 274(d) to substantiate the deductibility of the expenses. Petitioners have conceded that the L & L Group is not entitled *455 to deduct a portion of the disallowed expenses. The respective amounts of travel, entertainment, and gift expenses claimed by the Group, disallowed by respondent, conceded by the Group as nondeductible, and remaining in dispute, are set forth below: Year Ended June 30
1976
1977
1978
Claimed as Deductions
$ 155,298.00
$ 230,436.00
$ 174,565.00
Disallowed by Respondent
46,763.75
54,732.28
75,190.45
Conceded by the Group
16,240.66
23,162.31
26,621.33
Remaining in Dispute
30,523.09
31,569.97
48,569.12
Respondent determined in his notice of deficiency to the Leshes that the following amounts deducted by the L & L Group as travel and entertainment expenses were personal expenses of Leshe, and that the amounts paid by the Group were includable in Leshe's income as constructive dividends: Expenditures
1975
1976
1977
Cash Advances to Leshe
From U.S. Companies
$ 6,300.00
$ 15,241.00
$ 12,300.00
From Puerto Rican Company
--   4,917.00
2,000.00
Sunset Country Club
Charges
2,902.81
4,295.59
3,225.08
Other Charges
96.20
487.45
223.35
Puerto Rico Air and Hotel
--   1,157.53
--   Total
$ 9,229.01
$ 26,098.57
$ 17,748.43
*456 Respondent now concedes that the amounts referred to as Cash Advances to Leshe from Puerto Rican Company are not includable in his income as they are duplicates of amounts included in Cash Advances to Leshe from U.S. Companies. L & L had an account at the Sunset Country Club. Leshe and his wife used the club for personal purposes, but kept no records of the personal use. The amounts referred to as Sunset Country Club charges represent L & L's payments of bills from the Sunset Country Club. The amounts referred to as "Other Charges" include the following expenses: Personal Expenses
$ --  [18] $ 373.32
[19] $ 134.40
Miscellaneous Expenses
96.20
114.13
88.95
$ 96.20
$ 487.45
$ 223.35
The amount referred to as Puerto Rico Airfare and Hotel includes *457 Mrs. Leshe's airfare to Puerto Rico to accompany Leshe on a trip to Puerto Rico, and one-half of the couple's hotel and cash expenses there. OPINION
Deductions
Respondent's determination in his notice of deficiency that the expenses at issue are not deductible is presumed correct, and the burden of proving it incorrect rests on petitioner. Welch v. Helvering, supra at 115; Rule 142(a). After a careful review of the entire record, we conclude that the L & L Group has failed to prove that it is entitled to deduct travel and entertainment expenses in excess of those allowed by respondent. Although the Group introduced both documentary and testimonial evidence that purports to substantiate the deductibility of travel and entertainment expenses, it failed to establish that those expenses had not been among those that had been allowed by respondent. Respondent allowed the bulk of the travel and entertainment expenses deducted by the L & L Group. The Group had the burden of proving that it incurred deductible expenses in addition to those allowed by respondent, and it failed to do so. We accordingly hold that the L & L Group has failed to prove that *458 it is entitled to deduct travel and entertainment expenses in excess of those allowed by respondent.
Constructive Dividends
Respondent determined that the L & L Group paid personal travel and entertainment expenses incurred by Leshe and that the payments were constructive dividends to him. Leshe does not dispute that a corporation's payment of a shareholder's personal travel and entertainment expense can constitute a constructive dividend to the shareholder. See Cirelli v. Commissioner,82 T.C. 335, 351-352 (1984). Leshe asserts instead that he has substantiated the business purpose of the expenditures.[20] We analyze below the proof of business purposes that Leshe offered with respect to each category of expenses. *459 Cash Advances - Cash advances represent cash advanced to Leshe. Leshe testified that he used the advances to pay the expenses he incurred while traveling on business; and prepared a 46 page exhibit on which he attempted to reconstruct his use of the advances. Although we sympathize with Leshe and are impressed by his efforts to reconstruct from memory his use of the cash advances at this late date, we are unable to conclude from the evidence presented that the advances were used entirely for business purposes. The expenses listed on the reconstruction are noticeably imprecise, [21] and the reconstruction fails to identify the business purpose of a large amount of the expenses, which it simply lists as "miscellaneous." Despite the defects in Leshe's attempt to reconstruct his use of the cash advances, his efforts convince us that he used a portion of the cash advances for business purposes. We recognize that in these circumstances it is our responsibility to estimate the amount of the advances that petitioner used a business purpose. Cohan v. Commissioner, supra.Doing the best we can considering the inadequate record, and weighing our judgment heavily against *460 Leshe as he is responsible for the deficiency in the record, we hold that Leshe used half of the advances for business purposes and that only half of the cash advances from U.S. companies are taxable to him as constructive dividends. Sunset Country Club Charges - Leshe admits he and his wife made personal use of the Sunset Country Club but estimates that 80 to 90 percent of the charges paid by the L & L Group were business related. Leshe's testimony one again convinces us that part of the charges were business related. We are unconvinced, however, that Leshe accurately identified the proportion of the charges that were business related. Applying the Cohan rule on the basis of the record as a whole, we conclude that two-thirds of the payments to the Sunset Country Club were business related, and that only one-third of the payments are taxable to Leshe as constructive dividends. Other Charges, and Puerto Rico Air and Hotel - Leshe has failed to carry his burden of proving that the remainder of the expenses were business related. An exhibit Leshe prepared identifies most of the expenses labeled "Other Charges" as personal *461 expenses, [22] and Leshe failed to introduce evidence that the remainder of the "Other Charges" were business related. Leshe admitted that his wife accompanied him to Puerto Rico in March of 1976. His testimony failed to establish a business purpose for her presence. The evidence similarly does not prove that respondent's computation of Mrs. Leshe's share of the expenses of the trip was inaccurate. We accordingly hold that Leshe has failed to prove that the travel and entertainment expenses identified as "Other Charges" and "Puerto Rico Air and Hotel" did not constitute constructive dividends to him. In sum, we hold that the following amounts of travel and entertainment expenses paid by the L & L Group are taxable to Leshe as constructive dividends. Expenditure
1975
1976
1977
Cash Advances to Leshe
From U.S. Companies
$ 3,150.00
$ 7,620.50
$ 6,150.00
From Puerto Rican Company
--   --   --   Sunset Country Club
Charges
967.60
1,431.86
1,075,03
Other Charges
96.20
487.45
223.35
Puerto Rico Air and Hotel
--   1,157.53
--   $ 4,213.80
$ 10,697.34
$ 7,448.38
*462 FIN AND FIFTY INVESTMENT
FACTS In August 1975, General Marine paid for stock in Fin & Fifty Investment Corp. ("Fin & Fifty"). General Marine also paid dues charged by Fin & Fifty in 1975, 1976, and 1977. Fin & Fifty owned a condominium apartment in Vero Beach, Florida, and General Marine's stock ownership entitled it to use the apartment. General Marine allowed its existing and prospective customers to use the apartment, and donated some of its time to charity. Leshe never used the apartment for personal purposes and his family never used it at all. Respondent determined that the following payments by General Marine to Fin & Fifty were constructive dividends to Leshe: Year
Amount
1975
$ 5,273
1976
1,500
1977
1,800
OPINION As we have discussed supra, where corporate property is used by a shareholder or his family for personal purposes, not proximately related to the conduct of corporate business, the value of the personal use of the property is includable in the shareholder's income. In this case we found as a fact that neither Leshe nor his family ever used the apartment owned by Fin & Fifty for personal purposes. We based our finding *463 on Leshe's testimony, which we found to be credible in this regard. We accordingly hold that Leshe has proven that General Marine's payments to Fin & Fifty did not represent constructive dividends to him. SHAREHOLDER WITHDRAWALS
FACTS Leshe and G. P. Jacobson, L & L's two shareholders, withdrew funds from various members of the L & L Group. The activities in their withdrawal accounts (as consolidated herein) are summarized as follows: Leshe
Other
Year
Withdrawals
Deposits
Credits
Balance
1/1/75
$ 54,798.40
1975
$ 77,554.07
($ 10,866.67)
$ --    121,485.80
1976
56,880.55
(557.66)
--    177,808.69
1977
83,013.89
(10,430.29)
(168,110.98)
[23] 82,281.31
G. P. Jacobson
Other
Year
Withdrawals
Deposits
Credits
Balance
1/1/75
$ 15,691.43
1975
$ 45,993.06
$ --    $ --    61,684.49
1976
7,637.49
--    --    69,321.98
1977
11,356.49
(350.00)
(62,535.03)
[24] 17,793.44
*464 The L & L Group deducted the following amounts of the withdrawals as salary expense for its year ended June 30, 1978: Withdrawal to
Amount
Leshe
$ 7,796.23
G. P. Jacobson
24,420.39
Total
$ 32,216.62
Respondent determined in his notice of deficiency to Leshe that the amounts withdrawn by Leshe in 1975 and 1976 were constructive dividends to him and increased his taxable income in those years by $ 67,243.40 and $ 62,822.89, respectively. Respondent determined further in the notice of deficiency that Leshe received a constructive dividend in 1977 of $ 168,110.98 when the L & L Group reduced the balance of his withdrawal account by that amount. Respondent determined in his notice of deficiency to the L & L Group that it was not entitled to deduct the $ 32,216.62 of the withdrawals that it had charged to its salary expense account. Respondent disallowed the deduction on the grounds that the withdrawals were nondeductible constructive dividends. In January of 1983, following respondent's issuance of his notices of deficiency to petitioners, Leshe transferred shares of stock to L & L in satisfaction of the withdrawals. OPINION Petitioners assert *465 that the withdrawals from the L & L Group by Leshe and Jacobson were loans which are not includable in Leshe's income and which the L & L Group is entitled to deduct when charged-off. In the context of a closely held corporation such as L & L, a bona fide loan exists only if at the time a withdrawal is made: (1) the shareholder intends to repay the withdrawal; and (2) the corporation intends to enforce the obligation. Estate of Chism v. Commissioner,322 F.2d 956, 959-960 (9th Cir. 1963), affg. T.C. Memo. 1962-6; Pierce v. Commissioner,61 T.C. 424, 430 (1974). Petitioners bear the burden of proving that the withdrawal was a loan. Welch v. Helvering, supra; Rule 142(a). Whether a withdrawal from a corporation is a loan is a factual question to be determined upon consideration of all the relevant evidence. Beaver v. Commissioner,55 T.C. 85, 91 (1970); Haber v. Commissioner,52 T.C. 255, 266 (1969), affd. per curiam 422 F.2d 198 (5th Cir. 1970). Constructive dividends can be found contrary to the expressed intent of the parties. Sachs v. Commissioner,277 F.2d 879, 882-883 (8th Cir. 1960), *466 affg. 32 T.C. 8155 (1959), cert. denied 364 U.S. 833 (1960). Factors that the courts have considered in distinguishing withdrawals that are loans from withdrawals that are dividends include the following: the extent to which the shareholder controlled the corporation, whether the corporation had a history of paying dividends; the existence of earnings and profits; the magnitude of the advances; how the parties recorded the advances on their books and records; whether the parties executed notes; whether security was provided for the advances; whether there was a fixed schedule of repayment; whether interest was paid or accrued; whether the shareholder made any repayments; whether the shareholder was in a position to repay the advances; and whether the advances to the shareholder were made in proportion to his stockholdings. Alterman Foods, Inc. v. United States,505 F.2d 873, 877 n. 7 (5th Cir. 1974); Pierce v. Commissioner,61 T.C. 424, 430-431 (1974); Saigh v. Commissioner,36 T.C. 395, 417-422 (1961). None of these factors, standing alone, is determinative. Altermann Foods, Inc. v. United States, supra at 876-877 n. 6. *467 These objective factors are useful in determining whether there is a true intention to repay. Alterman Foods, Inc. v. United States, supra at 877. Based on the entire record in this case, we conclude that petitioners have failed to carry their burden of proving that the withdrawals were loans. Petitioners assert that a number of factors support their position that the withdrawals were loans. The three main factors they appear to rely on are the L & L Group's alleged accounting for the withdrawals as assets, the lack of precise proportionality of the withdrawals to stockholdings, and Leshe's alleged repayment of the withdrawals. We found Leshe's testimony regarding the withdrawals to be unconvincing. He testified that the withdrawals were recorded as assets on the books of the L & L Group, but failed to introduce any documentary evidence to corroborate his testimony. We question the reason for his failure to produce the books and records of the L & L Group which should have been readily available to him. Even assuming, arguendo, that the withdrawals were recorded on the Group's books as assets, this factor is not determinative without further evidence *468 substantiating the existence of a bona fide loan. Chattanooga Savings Bank v. Brewer,17 F.2d 79, 80 (6th Cir. 1927) (per curiam), cert. denied 274 U.S. 751 (1927); Baird v. Commissioner,25 T.C. 387, 395 (1955). Petitioners also rely on repayments made by Leshe and Jacobson as further evidence that the withdrawals were loans. We note that the repayments that occurred during the years at issue did not result in a reduction of the net balance of the withdrawals. There were instead large net withdrawals during each of the years at issue. Leshe points also to a transfer of stock in January of 1983 to the L & L Group in satisfaction of the balance of his withdrawal account to be evidence of his intent to repay the withdrawals. In our view, Leshe's transfer would have been a more convincing indicator of an honest intent to repay had it occurred before respondent issued notices of deficiency to Leshe and the L & L Group in August of 1982. After that date, Leshe had an obvious motive for repaying the withdrawals. In these circumstances, we do not consider the repayments that occurred to be persuasive evidence that the withdrawals were bona *469 fide debts of Leshe and Jacobson. Baird v. Commissioner, supra at 394; Meyer v. Commissioner,45 B.T.A. 228, 238-240 (1941). Petitioners assert also that the fact that the withdrawals were not in exact proportion to the shareholdings of Leshe and Jacobson indicates that the withdrawals were not constructive dividends. We consider it significant that both of L & L's shareholders made sizable withdrawals. In our view, that offsets the fact that the withdrawals were not in exact proportion to their shareholdings. It is clear that the disbursement of corporate earnings to a shareholder may constitute a dividend to the shareholder even if it is not proportional to the shareholder's stockholdings. Commissioner v. Riss,374 F.2d at 167. From the evidence before us we are convinced that Leshe and Jacobson exercised their control of L & L to withdraw from members of the L & L Group whatever funds they desired at such times and in such amounts as they chose. They were not required to execute written documents evidencing the withdrawals and there was no fixed schedule of repaying the withdrawals. Although Leshe gave vague testimony that *470 the withdrawals bore interest and were partially collateralized, he was unable to recall what rate of interest was due on the withdrawals and he failed to name a specific piece of property that collateralized the withdrawals. He failed to introduce any documentary evidence corroborating his testimony. In these circumstances, we conclude that Leshe's withdrawals were constructive dividends to him. [25]
Petitioners argue that, should we conclude that the withdrawals were not bona fide loans, the withdrawals represented salary payments to Leshe and Jacobson, which are deductible by L & L. We reject the argument, however, as petitioners failed to establish that the parties intended him to be salary payments. As we have already discussed, the evidence indicates that the withdrawals were distributions with respect to stock -- constructive dividends. Having concluded that the withdrawals were constructive dividends, we must address the amount of withdrawals taxable as dividends to Leshe. Petitioners assert that Leshe's withdrawals from Inland do not constitute constructive dividends. According to petitioners, *471 Inland lacked earnings and profits, and withdrawals from it therefore could not be constructive dividends. In our view, Leshe's withdrawals from Inland constitute constructive dividends to him regardless of the amount of Inland's earnings and profits. We reach that conclusion because we consider all of Leshe's withdrawals from the L & L Group to be constructive dividends to Leshe from L & L. Leshe owned stock in L & L, not Inland. L & L owned Inland stock. Distributions received by Leshe from the members of the L & L Group must be viewed as having been paid by L & L on Leshe's L & L stock. L & L had ample earnings and profits from which to pay the dividends. We agree with petitioners, however, that respondent erroneously determined that Leshe received a $ 168,110.98 dividend in 1977 when L & L credited his withdrawal account in that amount. We have held that Leshe's withdrawals constituted constructive dividends, not loans. [26] Leshe received the constructive dividends when he made the withdrawals, not when his withdrawal account was credited by L & L. Respondent cannot have it both ways. *472 We hold that the net of the withdrawals over the deposits made by Leshe each year constituted constructive dividends to him. Cf. Meyer v. Commissioner, supra at 241. Those amounts are as follows: 1975
$ 66,687.40
1976
56,322.89
1977
72,583.60
As we have concluded that the withdrawals did not represent salary payments to Leshe and Jacobson, we hold that the L & L Group is not entitled to deduct the $ 32,216.62 that it charged to its salary expense account in its year ended June 30, 1978. NEGLIGENCE
FACTS Respondent determined that the L & L Group and the Leshe's are liable for the addition to tax provided by section 6653(a) for their years ended June 30, 1978 and December 31, 1977, respectively. OPINION Section 6653(a) imposes an addition to tax of five percent if any part of an underpayment is due to negligence or intentional disregard of rules and regulations. Petitioners bear the burden of proving that the addition to tax determined by respondent does not apply. Luman v. Commissioner,79 T.C. 846, 860-861 (1982). Under section 6653(a), negligence is lack of due care or failure to do what a reasonable and *473 ordinarily prudent person would do under the circumstances. Neely v. Commissioner,85 T.C. 934, 947 (1985). After considering all of the relevant evidence, including petitioners' failure to maintain any records of the personal use of the L & L Group's corporate property, and their respective deduction of the expenses attributable to that personal use and failure to report as income the personal use, we hold that petitioners have failed to prove that they are not subject to the addition to tax for negligence. To reflect the foregoing and the concessions of the parties, Decisions will be entered under Rule 155.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as in effect in the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, except as otherwise noted. ↩
2. Respondent made a number of determinations with respect to the L & L Group's year ended June 30, 1976. The tax liability that resulted from those determinations was offset entirely by $ 6,007.08 of the $ 124,090 of investment tax credit that the L & L Group carried forward from its years ended June 30, 1972, 1973, 1974, and 1975. This Court has jurisdiction over respondent's determinations with respect to the Group's year ended June 30, 1976, to the extent that those determinations decreased the investment tax credit carried over to the Group's years ended June 30, 1977, and 1978. Sec. 6214(b). ↩
3. Respondent determined the negligence addition based on a tax liablity of $ 110,098.54 (corrected tax liability of $ 122,996.38 less $ 12,897.84 tax liability disclosed on timely filed return). The difference between the $ 110,098.54 tax liability subject to the negligence penalty and the $ 112,272.54 deficiency determined is due to a $ 2,174 tax abatement. ↩
4. Petitioners placed an issue but failed to settle respondent's disallowance of petitioners' claimed $ 80 medical expense deduction for the year ended December 31, 1975, and respondent's recomputation of the L & L Group's charitable contribution deductions for the years ended June 30, 1976 and 1977. Both of these issues are purely technical matters resulting from respondent's other adjustments to petitioners' income, and will be disposed of in the Rule 155 computation herein. Petitioners also placed in issue respondent's determinations with regard to the L & L Group's net operating losses and investment tax credits. The parties' stipulations resolve most, but not all, of the issues with respect to the L & L Group's investment tax credits and net operating losses. With respect to net operating losses, the parties stipulated the L & L Group's taxable income for its years ended June 30, 1973, 1974, 1975, 1979, 1980, and 1981; and stipulated further that the L & L Group had no net operating loss carryforward available for use in the year ended June 30, 1973. With respect to investment tax credits, the parties have stipulated that the L & L Group carried forward to its year ended June 30, 1976, $ 124,090 from its years ended June 30, 1972, 1973, 1974, and 1975. In the stipulation filed at trial, however, differences remained over the amounts of investment tax credit earned by the L & L Group during its years ended June 30, 1976, 1977, and 1978. Despite the fact that the stipulations, left unresolved a number of issues with respect to the L & L Group's investment tax credits and net operating losses, petitioners argue only one of the issues on brief. We treat petitioners' decision to argue on brief only one of the issues to be a concession of the remaining issues that were not resolved by the stipulations. Rule 151(e). See Strasser v. Commissioner,T.C. Memo. 1986-579. See also Calcutt v. Commissioner,84 T.C. 716, 721-722 (1985). The one issue petitioners argue on brief is that the L & L Group is entitled to a $ 462,626.99 investment tax credit in its year ended June 30, 1976, for barges purchased in that year but disposed of during its year ended June 30, 1978. Petitioners concede that the credit must be recaptured in the year of disposition. Respondent agrees on brief that petitioners' proposed treatment of the item is correct and will be reflected in the Rule 155 computation herein. Because of other adjustments to the income of the L & L Group for 1976, 1977 and 1978, the amount of unused investment tax credit carryforword into those years from prior years remains in issue. See note 2, supra.↩
5. Petitioner Katherine S. Leshe is involved herein only by having executed joint returns with Robert J. Leshe, and will not be referred to hereinafter. ↩
6. The L & L Group timely filed its consolidated Federal corporate income tax returns for its taxable years ended June 30, 1976, and 1976. Its filed its consolidated Federal corporate income tax return for its taxable year ended June 30, 1977, on October 24, 1978. The due date of the return was September 15, 1977. The L & L Group concedes that its failure to timely file the return was not due to reasonable cause. ↩
7. No amount was billed to the L & L Group during the year ended June 30, 1976 for work done to barge P4. Instead, the Group received a $ 14,500 reimbursement of an amount that it had apparently expensed in an earlier year. ↩
8. Peat Marwick's determination also involved the barge Plymouth. The $ 285,564.11 of repair costs capitalized by Peat Marwick does not include any of the repair costs for the Plymouth, however, as the L & L Group had already capitalized all of the Plymouth's repair costs. ↩
9. The record does not explain the $ 1 difference between the $ 285,564.11 that Peat Marwick capitalized and the $ 285,563.11 that respondent determined was required to be capitalized. ↩
10. Petitioners filed alone with their opening brief a motion to amend the L & L Group's petition to allege that the L & L Group is entitled to deduct $ 611,849.36 of repair expenses that it capitalized on its consolidated Federal corporate income tax return for the year ended June 30, 1976. We denied the motion. Petitioners argue on brief that the Group is entitled to deduct the $ 611,849.36, which includes expenses previously capitalized on barges P2 and Plymouth, not previously in issue herein. The determination of whether the expenses are deductible depends on the nature of the repairs and the purpose for which they were made. At trial, respondent was unaware of the need to present any evidence on this subject. This was a new matter, not properly pleaded, and we will not consider it. Rule 41(b); Rule 34(b)(4); Markwardt v. Commissioner,64 T.C. 989, 997 (1975); Estate of Mandels v. Commissioner,64 T.C. 61, 73 (1975); Estate of Horvath v. Commissioner,59 T.C. 551, 556↩ (1973). 11. Johnson testified that the scrap values of the towboats were no more than $ 80,000 each. ↩
12. The parties stipulated that the 1973 Buick was acquired by L & L in September 1976. Although parties are generally bound by their stipulations, this Court has the authority to disregard stipulations that are clearly contrary to the facts. Jasionowski v. Commissioner,66 T.C. 312, 318↩ (1976). In this case we choose to disregard the stipulated acquisition date as it is clearly a typographical error. The stipulation itself establishes that the Buick was acquired by L & L before September 1976 by stating that L & L had accumulated $ 3,023 of depreciation on the Buick by June 30, 1975. That is the amount of depreciation that L & L would have accumulated if it had acquired the Buick in September 1973 and depreciated it by the straight-line method over its three year useful life. 13. Respondent's position is that the 1973 and 1976 Buicks were used by Mrs. Leshe for her personal benefit, and that petitioners have failed to substantiate the business use of the remaining automobiles. ↩
14. Respondent has not asserted that Leshe received constructive dividends from his family's personal use of the L & L Group's other automobiles. ↩
15. Petitioners argue on brief that the L & L Group made business use of the Leshes' personal automobiles which offset their personal use of the L & L Group's automobiles. The issue of the L & L Group's business use of the Leshes' personal automobiles is a new one which had not been pleaded properly by petitioners. At trial, respondent was unaware of the need to present any evidence on the issue. As it was not pleaded properly, we will not consider it. Rule 41(b), Rule 34(b)(4); Markwardt v. Commissioner, supra↩ at 997. Petitioners presented no evidence to show error in respondent's determination of the fair rental values of the vehicles. 16. The L & L Group concedes on brief that the taxes are not deductible under sec. 164. ↩
17. Inland could have avoided paying the withholding tax even after failing to withhold by proving that its employees paid the taxes due on the wages from which the withholding was required to be made. See sec. 31.3402(d)-1, Withholding Tax Regs. ↩
18. Amount includes the following charges: ↩
Date
Payee
Amount
10/22/76
Webster Inn
$ 57.50
10/22/76
Holiday Inn
205.48
10/23/76
Mt. Peterson
83.43
10/76
Avis, Des Moines
26.91
$ 373.32
19. Amount includes the following charges: ↩
Date
Payee
Amount
1/4/77
Schneithorst's Restaurant
$ 6.60
2/5/77
Marcia Rommel
127.80
$ 134.40
20. The substantiation requirements of sec. 274(d) are a prerequisite to the deduction of travel and entertainment expenses. As Leshe is not seeking to deduct the L & L Group's payments of his travel and entertainment expenses, but is only seeking to show that the payments were made for a business purpose so that they will not be taxed to him as constructive dividends, the substantiation he offers need not meet the requirements of sec. 274(d). Henry Schwartz Corp. v. Commissioner,60 T.C. 728, 744 (1973); Ashby v. Commissioner,50 T.C. 409, 418↩ (1968). 21. Most are even multiples of five dollars. ↩
22. Page 6 of Exhibit 26 identifies $ 507.72 of the $ 807.00 of Other Expenses as personal expenses. ↩
23. This amount is less than the $ 82,377.31 shown on an exhibit stipulated to by the parties due to computational errors contained in the exhibit. ↩
24. This amount is greater than the $ 4,872.74 shown on an exhibit stipulated to by the parties due to computational errors contained in the exhibit. ↩
25. We make no holding as to Jacobson, since he is not a petitioner before us. ↩
26. Had the withdrawals constituted loans, respondent's position may have been valid. See sec. 61(a)(12); Shephard v. Commissioner,340 F.2d 27 (6th Cir. 1965), cert. denied 382 U.S. 813↩ (1965).