T.C. Memo. 2004-286


UNITED STATES TAX COURT


ESTATE OF HOWARD GILMAN, DECEASED,
BERNARD D. BERGREEN AND NATALIE MOODY, EXECUTORS, Petitioner
v. COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 10748-02.          Filed December 28, 2004.


Thomas H. Moreland, Jeffrey S. Boxer, Jerome J. Caulfield,
and Richard B. Covey, for petitioner.

Milan K. Patel, Frank J. Jackson, and Gerard Mackey, for
respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


COLVIN, Judge:  Respondent determined a $30,475,381.13
deficiency in the Federal estate tax of the Estate of Howard
Gilman (the estate).

When Howard Gilman (decedent) died in 1998, his estate consisted primarily of stock of Gilman Investment Co., Inc. (GIC), a holding company for decedent's businesses and other assets (the Gilman assets). Before he died, decedent formed the Howard Gilman Foundation (the foundation). Decedent bequeathed the residue of his estate to the foundation.

Bernard D. Bergreen (Bergreen) and Natalie Moody (Moody) were coexecutors of the estate, the managers of a limited liability company named HG Estate, LLC (HG), officers of GIC, and members of the board of directors of the foundation. Bergreen and Moody hired William Davis (Davis) to serve as chief operating officer of Gilman Paper Co. and Gilman Building Products, effective June 1998.

In 1999, as part of a tax-free reorganization under section 368,[1] the executors transferred the GIC stock and all of GIC's assets to HG and its subsidiaries. The foundation was the only member of HG. Bergreen received tax advice that, if the restructuring were completed by January 28, 1999, and the assets then sold, HG would save $160 million in tax on capital gains which would been have resulted if the estate had sold the assets.

---

[1] Section references are to the Internal Revenue Code in effect as of the date of decedent's death. Rule references are to the Tax Court Rules of Practice and Procedure. Amounts have been rounded to the nearest dollar.

The estate received $143 million in promissory notes from some of HG's businesses when the assets were transferred to HG. The notes were scheduled to pay interest from 1999 to 2004, and to be fully repaid in January 2004.

The financial condition of HG's businesses declined in 2001. In October 2002, which was 15 months before the estate was scheduled to receive repayment of the $143 million in notes, the estate borrowed about $38 million (the Farm Credit loan), repayable over 10 years. The estate agreed to pay almost $16 million in closing costs and interest, which it seeks to deduct as an administration expense under section 2053. The estate also seeks to deduct administration expenses which it paid from the estate's income.

After concessions, the issues for decision are:

1. Whether (or to what extent) the estate may deduct as administration expenses under section 2053(a)(2) interest and closing costs for the $38 million Farm Credit loan. We hold that it may to the extent described herein.

2. Whether, in addition to the $1 million respondent conceded, the estate may deduct $3,507,723 as additional administration expenses (additional expenses) which it paid from income of the estate. We hold that the estate may deduct additional administration expenses of $1,803,939.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

A.   Decedent and the Executors of Decedent's Estate

Decedent resided in New York, New York, when he died on January 3, 1998.  Bergreen and Moody, the executors of decedent's estate, lived in New York, New York, when the petition was filed.  Bergreen is an attorney and was decedent's close business adviser.  Bergreen is an officer and director of decedent's corporations.  Moody was decedent's administrative assistant and vice president and secretary of decedent's corporations.

In 1981, decedent formed the foundation to support the performing arts, wildlife conservation, and cardiovascular disease research.  The foundation is tax exempt under section 501(c)(3).  Bergreen was a director of the foundation.  Moody became a director of the foundation in 2000.

Decedent owned all of the outstanding stock of Gilman Investment Co. (GIC), some apartments, and $702,890 in cash or cash equivalents when he died.  The fair market value of decedent's estate was more than $611 million when he died.

B.   The Gilman Businesses and the Hiring of Davis

Decedent was chairman of the board of directors of GIC when he died.  GIC owned about 50 businesses, including Gilman Building Products, Gilman Paper Co., Gilman Timberlands, and Gilman Financial Services.  GIC's holdings included timberland,

sawmills, a railroad, rail cars, and a financial services company.  Gilman Building Products produced lumber.

Gilman Building Products had net positive cashflows which averaged more than $42 million per year in 1994-99.  The GIC businesses, including Gilman Paper Co., Gilman Timberlands, and Gilman Financial Services had net negative cashflows of at least $40 million in 1998.  GIC used the net positive cashflow of Gilman Building Products to pay operating expenses of the GIC businesses.

GIC also owned the White Oak Plantation (White Oak), an 8,000-acre estate that has a conference center and a wildlife conservation center with a scientific breeding program for endangered animals and birds.  White Oak houses decedent's collection of about 6,000 photographs, which, according to one appraisal obtained by Bergreen, was worth $80 million in 1998.  Gilman Building Products used about one-third to one-half of its annual net positive cashflow to maintain White Oak and to fund the operations and grants of the foundation.

Davis was the chief operating officer of Gilman Paper Co. and Gilman Building Products until he retired in February 1996.  His successor died of cancer in June 1998.  Early in 1998, while Bergreen and Moody were officers of GIC and coexecutors of decedent's estate, Bergreen, Moody, and Davis agreed that Davis would be paid $5 million to resume his duties as chief operating

officer of Gilman Paper Co. and Gilman Building Products in June 1998. Bergreen and Moody wanted Davis to help revive the Gilman businesses. Davis was paid $1.5 million in 1998, $1.2 million in 1999, and $1.2 million in 2000.

C. Decedent's Will

Article 10 of decedent's will provides that his executors were not to receive executor's fees or commissions, but that they would continue to receive compensation from Gilman Paper Co. or Gilman Investment Co. (GIC) as they had when decedent was alive. Decedent directed that Gilman Paper Co. be sold. Article 12 of decedent's will provides:

> if the * * * [Gilman Paper Co.] is sold by my executors while Bernard D. Bergreen is acting as an executor, Bernard D. Bergreen, P.C. shall be entitled to compensation for services rendered in connection with such sale * * *.

Article 13 of decedent's will provides that the executors may decide whether receipts were income or principal and whether expenses were paid from income or principal. Article 8 provides that the foundation was to receive the residue of the estate after payment of estate taxes and administration expenses.

D. Administration of Decedent's Estate in 1998-99

1. Loans, Payment of Expenses, Bequests, and Estate Taxes

The executors paid estate administration expenses including more than $150,000 for funeral expenses and perpetual care and more than $4 million in legal fees. The executors also paid 26

cash bequests totaling $30,565,000 in May 1998. GIC borrowed $30,565,000, which the estate borrowed from GIC to pay the cash bequests. GIC and the estate were illiquid at that time.

Several months after decedent died in 1998, Bergreen arranged for a $90 million line of credit so GIC could consolidate loans to help sell the GIC businesses. GIC and the estate were still illiquid in October 1998. On October 3, 1998, GIC borrowed $6 million, which it gave to the estate to pay some of its Federal and State estate taxes.

2. <u>Transfer of GIC Stock, Assets, and Liabilities to HG and HG Subsidiaries</u>

Late in 1998, Bergreen received tax advice that, by transferring stock, assets, liabilities, and businesses of GIC and its subsidiaries from the estate to a newly organized limited liability company and its subsidiaries through a series of mergers tax free under section 368 (the restructuring), the estate could save $160 million in capital gains tax that would result if the estate sold GIC's assets and businesses. To accomplish those tax savings, (1) the restructuring had to be completed before January 28, 1999, see sec. 1.337(d)-4(e), Income Tax Regs.; and (2) Gilman Building Products could not be sold for 5 years because of the continuity of business requirement, see sec. 1.368-1(d), Income Tax Regs.

The executors and the foundation decided to implement the restructuring plan. HG was organized on January 13, 1999. The foundation became its only member.

The restructuring was completed on January 14, 1999. As a result of the restructuring: (a) The Gilman businesses, except for 77,000 acres of timberland already under contract of sale,[2] were transferred from GIC to HG; (b) GIC, the sole member of HG, merged into the foundation, making the foundation the sole member and sole owner of HG; (c) Bergreen and Moody were the sole managers of HG, which gave them exclusive control over HG's assets and their subsequent sale; and (d) HG and its subsidiaries had legal title to all the assets previously held by GIC and its subsidiaries other than 77,000 acres of timberland held by the foundation.[3]

HG obtained a $250 million line of credit from NationsBank to refinance and consolidate debt and to provide working capital for the Gilman businesses. After the restructuring, HG and its subsidiaries began to sell the GIC assets and businesses except for Gilman Building Products.

---

[2] Before the restructuring, GIC transferred title to 77,000 acres of timberland to the foundation.

[3] The foundation sold the 77,000 acres of timberland in Jan. 1999.

3.   The Notes

As part of the restructuring, the estate received $143 million in notes (subordinated to the $250 million line of credit) from subsidiaries of Gilman Building Products and from Gilman Paper Co.'s railroad.  All of the notes were due to be paid in full on January 31, 2004.[4]

Interest but not principal was payable annually beginning January 31, 2000.  However, on January 28, 2000, the executors and obligors of the $143 million in notes agreed that interest on the notes could be deferred at the option of the obligors.  The total amount of interest to be paid by 2004 was about $46.5 million.  The executors expected to use the interest and principal payments on the notes to pay estate expenses including Federal and New York State estate taxes.

After the restructuring, the estate held $183 million in assets, including the notes in the amount of $143 million, and apartments and cash.

4.   Election To Defer Tax Payments

On April 1, 1999, the executors elected under section 6166 to pay Federal estate tax in 10 annual installments, beginning on

---

[4] As part of the sale of Gilman Paper Co. in Dec. 1999, a debt of $5 million (part of the $143 million in notes) was cancelled.

October 3, 2003.[5] The executors also elected under New York Tax Law section 997 (McKinney 1999) to pay New York estate tax in 10 annual installments.

E. HG and Foundation Finances

1. HG's Cash Requirements in 2000-02

Beginning in 2000, there was a reduction in the net positive cashflow of Gilman Building Products. Gilman Building Products' net positive cashflow decreased from an average of more than $42 million per year in 1994-99 to $3.5 million in 2000, $19 million in 2001, and $9.2 million in 2002.

By the end of 2001, HG needed $30 to $40 million in cash and cash equivalents as working capital to pay operating expenses of its businesses. At that time, HG had cash and cash equivalents of $36.3 million. On October 18, 2002, HG had cash and cash equivalents of $16.7 million.

HG received more than $287 million from the sale of Gilman assets and businesses from 1999 to 2002. HG used most of those receipts to repay the $250 million line of credit from NationsBank. HG used the remainder as working capital and to pay other expenses.

---

[5] The estate paid four installments of interest only, beginning Oct. 3, 1999.

- 11 -

## 2. The Foundation's Compensation Committee

In 2001, the foundation's compensation committee, which was formed at the request of the attorney general of New York pursuant to the attorney general's supervisory authority over charitable foundations in the State of New York,[6] hired a compensation consultant, Pearl Meyer & Co. (Pearl Meyer), to evaluate reasonable compensation for Bergreen, Moody, and Davis and six other executives of the foundation and its subsidiaries. In October 2001, the compensation committee reviewed Pearl Meyer's report and recommended that the foundation pay Bergreen $17 million as compensation for services he provided to HG under article 10 and for selling Gilman Paper Co. under article 12. Bergreen and Moody requested, and the compensation committee recommended, that Davis receive $5 million for his return from retirement and the successful turnaround and sale of Gilman Paper Co. The foundation's board of directors approved the committee's recommendation.

## F. Administration of the Estate in 2000-03

### 1. Allocation of $1 Million in Expenses to Income

On November 6, 2001, the executors reported to respondent that they had agreed to pay legal fees totaling $3.6 million,

---

[6] See N.Y. Est. Powers & Trusts Law sec. 8-1.4 (McKinney 2003) (attorney general has enforcement and supervisory powers over nonprofit entities); In re Estate of Shubert, 442 N.Y.S.2d 703, 712-713 (N.Y. Sur. 1981).

$3,038,000 of which had been paid.  The executors elected to pay $1 million of these expenses from income by executing Form 4421, Declaration--Executor's Commissions and Attorney's Fees.

### 2. The Executors' Decision To Pay the Estate Tax in Full

During the examination of this case, which began in 2001, the Internal Revenue Service (IRS) examiner told the tax counsel for the estate that, because the estate had transferred assets to HG, the estate's ability to continue to defer estate tax under section 6166 was doubtful, and acceleration of payment of all estate tax under section 6166(g) would likely result.

In January and February 2002, the executors obtained written opinions from tax attorneys recommending that the estate pay its estate tax in full to avoid the risks of acceleration under section 6166(g).  The executors decided to follow that advice.

### 3. Farm Credit Loan

The executors estimated that the estate needed $38 million to pay: (a) $9,797,400 for Federal estate tax and interest; (b) $2,915,900 for New York State estate tax and interest; (c) $19,470,525 for compensation for Bergreen; (d) $5 million for compensation for Davis; and (5) $816,175 for other miscellaneous administration expenses.

On October 18, 2002, Bergreen and Moody, acting as executors, borrowed $38 million from Farm Credit Bank of North Florida, CA (Farm Credit loan).  The loan was secured by a

mortgage on White Oak and guaranteed by HG.  HG pledged collateral for the Farm Credit loan.  The Farm Credit loan is payable over 10 years with a fixed schedule for payment of principal and interest.  The total amount of interest to be paid on the Farm Credit loan is $15,734,293.  Closing costs for the Farm Credit loan were $200,000.

On November 1, 2002, the estate used proceeds from the Farm Credit loan to pay $9,610,302.91 in Federal estate tax and $2,805,802.13 in New York estate tax.  The estate retained the rest of the proceeds from the Farm Credit loan to pay compensation to Bergreen and Davis and certain administration expenses.

As of February 1, 2004 (the day after the due date for repayment of the $143 million in notes), the estate was scheduled to have paid interest on the Farm Credit loan totaling $2,665,850 and principal in the amount of $742,448.47, leaving a principal balance of $37,257,551.53.

4.    Income Tax Returns and Administration Activities in 2003

From March 1999 to January 2003, the estate received $23,617,031 cash from HG as interest payments on the $143 million in notes.[7]  On July 1, 2002, HG gave the estate a $22.9 million note for unpaid, accrued interest due through January 31, 2002.

---

[7]  The estate received $4,705,631 from HG in 2003.

However, the estate reported total income of only $2,844,738 for 1998-2002 on its Forms 1041, U.S. Income Tax Return for Estates and Trusts, for tax years 1998-2002.

On May 1, 2003, the estate prepared a draft fiduciary accounting which states that the estate paid $37 million from principal to administer the estate. As of October 8, 2003, the executors had paid legal expenses to three law firms and consulting fees to two firms totaling $4,507,723.

On November 24, 2003, the executors changed the amount of administration expenses allocated to estate income from $1 million to $4,507,723.

G.  Surrogate's Court Proceeding With Respect to Amount of Compensation Due to Bergreen

Bergreen and Moody as executors filed a petition on a date not specified in the record in the Surrogate's Court of the County of New York seeking approval of the amount of Bergreen's compensation. The Surrogate's Court supervised negotiations in May 2003 between the State attorney general's office, Bergreen, and the independent directors of the foundation, in which the parties agreed that Bergreen would be paid $12.5 million.

OPINION

A.  Whether the Estate May Deduct Interest and Closing Costs
    Paid on the Farm Credit Loan

    1.  Contentions of the Parties and Background

The estate contends that all of the Farm Credit loan proceeds were borrowed for the purpose of paying estate taxes and deductible administration expenses of the estate including (a) Bergreen's compensation of $19,470,525;[8] (b) Davis's compensation of $5 million; and (c) miscellaneous administration expenses of $816,175.

Respondent contends that none of the interest paid on the Farm Credit loan is deductible under section 2053.  Respondent contends that the loan was unnecessary because the estate had enough liquid assets when it borrowed about $38 million from Farm Credit to pay its taxes and administration expenses.  Respondent alternatively contends that, if the estate was illiquid when it obtained the Farm Credit loan, the loan was unnecessary because: (a) Some of the estate's planned uses of the loan proceeds (e.g., compensation for Bergreen and Davis) are expenses of HG and are not administration expenses of the estate; (b) the estate has not substantiated miscellaneous administration expenses of $816,175; (c) the executors caused the estate's illiquidity by distributing

_____

[8] The estate concedes that $2.4 million to be paid to Bergreen as compensation for 1996 and 1997 is not an administration expense.

the estate's principal assets to the foundation in the restructuring; (d) the estate should have retained enough assets to sell to pay its expenses; (e) the executors had elected to pay the estate tax in 10 annual installments; and (f) the executors could have demanded that the foundation return some of the proceeds from HG's sale of assets transferred from the estate. The estate disputes respondent's contentions.

An estate may deduct administration expenses allowable under the probate law of the jurisdiction where the estate is being administered, sec. 2053(a)(2), and which are actually and necessarily incurred in administering a decedent's estate, Estate of Grant v. Commissioner, 294 F.3d 352, 353 (2d Cir. 2002), affg. T.C. Memo. 1999-396; sec. 20.2053-3(a), Estate Tax Regs.[9]

Interest on funds borrowed to pay taxes or other debts of the estate while the estate is illiquid (i.e., while the estate

---

[9] Sec. 20.2053-3(a), Estate Tax Regs., provides in part:

The amounts deductible from a decedent's gross estate as "administration expenses" * * * are limited to such expenses as are actually and necessarily incurred in the administration of the decedent's estate; that is, in the collection of assets, payment of debts, and distribution of property to the persons entitled to it. The expenses contemplated in the law are such only as attend the settlement of an estate and the transfer of the property of the estate to individual beneficiaries or to a trustee * * *. Expenditures not essential to the proper settlement of the estate, but incurred for the individual benefit of the heirs, legatees, or devisees, may not be taken as deductions.

can obtain funds to pay those expenses only through sale of estate assets at a price below the normal market price) may be deductible as an administration expense under section 2053(a)(2). Estate of Todd v. Commissioner, 57 T.C. 288 (1971) (9-month loan); Estate of Thompson v. Commissioner, T.C. Memo. 1998-325 (series of five 1-year notes); McKee v. Commissioner, T.C. Memo. 1996-362 (note with term of 85 days); Estate of Graegin v. Commissioner, T.C. Memo. 1988-477 (loan with balloon payment in 15 years, which was the life expectancy of decedent's surviving spouse, the beneficiary of a trust the assets of which could be used to repay part of the loan); see also Estate of Sturgis v. Commissioner, T.C. Memo. 1987-415 (term of loan not stated in the opinion; it was at least 3 years).

Under New York law, interest incurred on a loan may be deductible as an administration expense if it is necessary and the estate lacks sufficient liquid assets.  See, e.g., N.Y. Est. Powers & Trusts Law, sec. 11-1.1(b)(22) (McKinney 2003).

The estate bears the burden of proof on all issues in dispute in this case.[10]  See Rule 142(a)(1).

_____

[10] We treat the estate's failure to respond in answering brief to respondent's argument in opening brief as the estate's concession as to burden of proof.  We agree with respondent's contentions that (1) respondent raised no new matter in its answer; (2) the litigation guideline memo (Mar. 14, 1989) cited by respondent does not shift the burden of proof, see sec. 6110(k)(3); (3) Rauenhorst v. Commissioner, 119 T.C. 157 (2002), relating to the effect of a revenue ruling, is distinguishable;

(continued...)

As discussed next, we hold that (a) it was not necessary for the estate to borrow funds to pay Bergreen or Davis because their compensation was an expense of HG and was not an administration expense of the estate, (b) it was not necessary for the estate to borrow funds to pay administration expenses of $816,175, (c) it was necessary for the estate to borrow funds to pay Federal and state estate taxes, and (d) it was not necessary for the estate to borrow funds for a term extending beyond January 31, 2004, which is the date the estate was due to receive repayment of the $143 million in notes.

2.   **Whether Compensation Paid to Bergreen and Davis Is an Estate Expense**

a.   **The Relationship Between the Estate and HG**

The estate contends that expenses incurred relating to the GIC assets after the estate transferred those assets to HG and its subsidiaries in the restructuring are estate expenses.  The estate points out that, after the restructuring, (i) it continued to exist and Bergreen and Moody retained the same control over the sale of the GIC assets as they had before the restructuring; (ii) the Gilman assets were not transferred to the foundation; and (iii) the HG agreement gave exclusive management and control over the Gilman assets to Bergreen and Moody, who were also the executors of the estate.  The estate contends that, by virtue of

---

[10](...continued)
and (4) the estate does not contend that sec. 7491 applies.

Bergreen's and Moody's power over HG, expenses relating to the Gilman assets were estate expenses.  The estate also contends that Bergreen and Moody acted primarily as executors in facilitating HG's sale of Gilman assets, and that they did so to benefit the estate.  We disagree.

Bergreen and Moody wore many hats:  they were executors of the estate, managers of HG, and members of the board of directors of the foundation.  As part of the restructuring, the estate transferred GIC assets to HG and its subsidiaries.  As a result, the GIC assets, including the Gilman businesses, ceased to be estate assets, and Bergreen's and Moody's management services related to those assets were performed for HG and its subsidiaries.  The transfer of assets from the estate to HG and its subsidiaries severed the relationship the executors had with the transferred assets in their capacity as executors.  Insofar as Bergreen and Moody had the same duties and responsibilities as managers of HG with respect to those assets as they had as executors, it does not follow that their actions for HG were taken in their capacity as executors.  The estate claims both the tax benefits resulting from transferring the Gilman assets to HG and its subsidiaries (estimated by its tax advisers to be a tax savings of $160 million), and all of the deductions that would have been available to the estate if it had not transferred those assets.  Using executors to run a commercial enterprise does not

convert expenses of the enterprise to estate expenses. The estate cannot have it both ways. See <u>Sharvy v. Commissioner</u>, 67 T.C. 630, 641-642 (1977), affd. 566 F.2d 1118 (9th Cir. 1977); <u>L & L Marine Serv., Inc. v. Commissioner</u>, T.C. Memo. 1987-428; <u>Biggs v. Commissioner</u>, T.C. Memo. 1968-240, affd. 440 F.2d 1 (6th Cir. 1971). Expenses related to the GIC assets were not estate expenses after the estate transferred those assets to HG. See <u>Deputy v. Du Pont</u>, 308 U.S. 488, 493-494 (1940) (taxpayer may deduct own expense and not that of another); <u>Estate of Grant v. Commissioner</u>, 294 F.3d at 354 (Court of Appeals denied deduction under section 2053 of administration expenses incurred to administer assets of a trust but allowed deduction of administration expenses incurred to administer assets of the estate).

> b. <u>Whether Bergreen's Compensation Was an Obligation of the Estate</u>

The estate contends that $17 million of the Farm Credit loan was borrowed to compensate Bergreen for services performed for the estate. The estate also contends that amount was an administration expense of the estate and was owed to Bergreen under the will. We disagree.

Article 10 provides that Bergreen is not to receive commissions or other fees for acting as executor and that he was to continue to be compensated by the Gilman businesses for services rendered after decedent died as he had been before

decedent died. Bergreen was not entitled to compensation by the estate under article 10.

Article 12 provides that, if the executors sell Gilman Paper Co. while Bergreen is an executor, Bernard D. Bergreen, P.C., is to be compensated for services rendered in connection with that sale. The estate contends that Bergreen is entitled to be paid by the estate under article 12 because the executors agreed to act as managers of the assets of HG and its subsidiaries to allow the executors to maintain control over the Gilman assets. The estate also contends that HG and its subsidiaries were created to effect the executors' sale of the Gilman assets, and that Bergreen retained complete control over the sale of those assets after their transfer to HG and its subsidiaries. We disagree.

As a result of the transfer of assets from the estate to HG and its subsidiaries, the estate no longer owned the Gilman assets; HG and its subsidiaries did. Because the sale occurred after the restructuring, Gilman Paper Co. was sold by HG (not the estate). Bergreen and Moody rendered services in connection with its sale in their capacity as managers of HG, not as executors of the estate. Thus, Bergreen was performing services for HG, not the estate. Bergreen was not entitled to compensation by the estate under article 12.

We conclude that Bergreen is not entitled to compensation by the estate.  Thus, it was not necessary for the estate to borrow funds to compensate him.

            c.    Whether Davis's Compensation Was an Obligation of the Estate

The estate contends that Davis's $5 million compensation is an administration expense because Bergreen and Moody, acting in their capacity as executors, hired Davis to manage Gilman Paper Co. and to help Bergreen sell the Gilman assets, and that his work for the GIC businesses benefited the estate.  We disagree.

Bergreen and Moody were officers of GIC (as well as executors of the estate) when they hired Davis to help revive the Gilman businesses.  Davis was rehired to serve as chief operating officer of Gilman Paper Co. and Gilman Building Products in June 1998.  The foundation's compensation committee approved Bergreen's and Moody's request to pay Davis $5 million for his return from retirement and his turnaround and sale of the Gilman Paper Co.  Davis was paid $1.5 million in 1998, and $1.2 million in 1999 and 2000.  It appears from the foundation compensation committee report that those payments were not part of the $5 million that Bergreen and Moody offered him and that the compensation committee in October 2001 recommended that he be paid.  The accounting prepared by the estate as of February 28, 2003, does not show that the estate made those payments.  It appears that Bergreen and Moody hired Davis in their capacity as

officers of GIC, and that the Gilman businesses (not the estate) paid Davis those amounts.

The estate contends (and Bergreen and Moody testified) that Davis was rehired to help to sell the Gilman businesses. We disagree. First, Isabella Rossellini (Rossellini), an independent director of the foundation, testified, and the Pearl Meyer report states, that Davis was hired to run the businesses. The Pearl Meyer report states in pertinent part: "Since June 1998, Mr. Davis has devoted his full professional energies and time to Gilman business matters." A document that Bergreen prepared to justify his compensation to the foundation's compensation committee states that he hired Davis to fix the companies. Neither the Pearl Meyer report nor Bergreen's document indicates that Davis was hired to help sell the Gilman businesses. We conclude that Davis performed services for the Gilman businesses and not for the estate. Thus, it was not necessary for the estate to borrow funds to compensate him.

3.   Miscellaneous Expenses of $816,175

The estate contends that the executors reasonably estimated the amount it needed to borrow to close the estate, and that, after calculating the tax savings resulting from deduction of the interest on the $38 million loan, the estate estimated that its tax savings would be enough to fund Bergreen's and Davis's compensation, leaving $816,175 to pay other miscellaneous

administration expenses.  The estate contends that a reasonable estimate satisfies the requirement of section 2053 that expenses be necessary for the administration of the estate because (a) only an estimate of the amount of the loan was possible when the estate obtained the loan, and (b) the estate's obligation to pay the $38 million loan and interest thereon is fixed.  Thus, the estate contends, it may deduct the interest on that portion of the loan to be used to pay miscellaneous expenses of $816,175.  We disagree because the record does not show what expenses are included in the $816,175 amount.  Thus, these expenses may no more be estate expenses than was the compensation for Bergreen and Davis.  See paragraph A-2, above.

4.    Whether the Estate Was Illiquid When It Borrowed Funds
      From Farm Credit

Respondent contends that, after the estate paid the cash bequests in May 1998, it had enough liquid assets with which to pay its estate taxes and administration expenses and thus did not need the Farm Credit loan.  We disagree.

After payment of the cash bequests and before the restructuring, the estate had more than enough assets to pay administration expenses and Federal and State estate taxes.  However, these assets were illiquid.  Every witness, including respondent's witnesses Rossellini, Justin Feldman, and John J. Kennedy (all of whom were independent directors on the board of

the foundation), testified that the estate borrowed funds because it and the Gilman businesses were illiquid.

Respondent contends that the executors' decision to transfer most of the estate's assets to HG and its subsidiaries on January 14, 1999, caused the estate's illiquidity. We disagree. The executors' decision to restructure did not cause the estate's illiquidity; the estate was illiquid both before and after the executors transferred estate assets to HG and its subsidiaries.

5.  Whether the Estate May Deduct Interest on a Loan That Could Have Been Avoided If the Estate Had Sold Illiquid Assets To Pay Its Taxes and Expenses

Respondent contends that the interest on the Farm Credit loan was not incurred out of necessity within the meaning of section 20.2053-3(a), Estate Tax Regs., because the executors could have avoided borrowing the funds by selling enough assets to pay the estate taxes and administration expenses. We disagree.

The executors acted reasonably in transferring property to HG and its subsidiaries on the basis of advice they had received that the restructuring would save the estate $160 million in tax. See Beard v. Commissioner, 4 T.C. 756, 758 (1945); Hobby v. Commissioner, 2 T.C. 980, 985 (1943); Tully Trust v. Commissioner, 1 T.C. 611, 620 (1943) (taxpayer's bona fide sales to third persons for sole purpose of reducing his or her tax liability was for legitimate business purpose; taxpayer was

entitled to tax benefit resulting from sale of capital asset); McKee v. Commissioner, 35 B.T.A. 239, 242 (1937) (trustees who realized tax savings by selling, rather than redeeming, matured bonds acted in the best interests of the trusts). We do not substitute our judgment for decisions of the executors to complete the restructuring in January 1999. See Estate of Todd v. Commissioner, 57 T.C. 288 (1971); Estate of Thompson v. Commissioner, T.C. Memo. 1998-325; McKee v. Commissioner, T.C. Memo. 1996-362; Estate of Sturgis v. Commissioner, T.C. Memo. 1987-415.

Second, the executors did not foresee the decrease in Gilman Building Products' annual net positive cashflow from more than $40 million per year in years before 2000 to $3.5 million in 2000. The decline in Gilman Building Products' financial condition contributed to HG's inability to pay the estate nearly $23 million of interest due in 2002. In light of the unforeseen decline in Gilman Building Products' financial condition and HG's and its subsidiaries' inability to fully pay interest due on the notes in 2002, it was necessary for the estate to borrow funds in 2002.

   6.   Whether the Farm Credit Loan Was Unnecessary Because
        the Executors Had Elected To Pay Estate Tax in 10
        Annual Installments

The executors elected on April 1, 1999, to pay Federal and New York estate taxes in 10 annual installments beginning in

2003. Respondent contends that the Farm Credit loan was unnecessary because the estate could have paid the annual installments of estate taxes from the proceeds of the sale of estate assets or from the interest or principal on the $143 million in notes, due on January 31, 2004, without borrowing funds from Farm Credit.

We disagree. After the executors elected to pay the estate tax in 10 annual installments, respondent's examiner told the estate's counsel that the estate's transfer of corporate assets to HG and its subsidiaries threatened the estate's ability to continue to defer payment of estate tax under section 6166, thus making acceleration of estate tax under section 6166(g) likely. Subsequently, on the advice of estate tax counsel, the executors decided to pay the estate tax in full. Thus, we disregard the fact that the estate had elected to pay the estate tax in 10 annual installments in deciding whether the Farm Credit loan was necessary.

7. <u>Whether, Under New York Law, the Executors Were Required To Have the Foundation Return Assets to the Estate To Pay Estate Tax</u>

Respondent contends that the loan was unnecessary because the executors were required, under New York law, to demand that the foundation return to the estate the amount of assets needed to pay estate taxes and administration expenses.

We disagree. Under New York law, if an estate is insolvent and the executor has distributed property from the residue that the testator designated was to be used to pay estate expenses, a residuary beneficiary must return that property to the estate to pay the estate's expenses. In re Estate of Schmuckler, 296 N.Y.S.2d 202, 207 (Sur. Ct. 1968); Buffalo Loan, Trust & Safe-Deposit Co. v. Leonard, 41 N.Y.S. 294, 299 (N.Y. App. Div. 1896). Under New York law, an estate is insolvent where its liabilities exceed its assets. In re Estate of Froehlich, 416 N.Y.S.2d 744, 745 (Sur. Ct. 1979); In re Estate of Jacob, 401 N.Y.S.2d 986 (Sur. Ct. 1978). An estate may be illiquid but not insolvent. In re Estate of Froehlich, supra at 746. Here, as the estate points out, although it was illiquid, it was not insolvent because it owned $143 million in notes after the restructuring. Thus, under New York law, the executors were not required to demand the return of assets from the foundation, and the foundation was not required to return assets to the estate. See, e.g., In re Estate of Schmuckler, supra; Buffalo Loan, Trust & Safe-Deposit Co. v. Leonard, supra.[11]

---

[11] Respondent contends that Bergreen and Moody had conflicts of interest among their roles as executors of the estate, managers of HG, and members and directors of the foundation, and that the conflicts caused them to fail to demand the return of the estate assets. In light of the fact that the executors were not required to demand the return of assets from the foundation, we need not consider respondent's conflicts of interest argument.

8.  <u>Whether the Estate Established Its Illiquidity After January 2004</u>

As part of the restructuring, the estate received $143 million in notes (subordinated to the $250 million line of credit) from subsidiaries of Gilman Building Products and from Gilman Paper Co.'s railroad.  All of the notes were due January 31, 2004, after the record closed in this case.  The $38 million Farm Credit loan was made in October 2002, with repayment to be completed in 10 years.

The estate contends that it was financially protected by the notes.  The estate does not contend, and the record does not show, that the obligors would refuse to make arrangements to fulfill their obligation to repay the $143 million in notes in 2004, or that the estate lacked legal recourse if HG refused to do so.  Respondent argued in the opening brief that the estate could have paid its taxes and expense from repayment of the $143 million in notes.  The estate did not respond to this argument. We cannot conclude on this record that the estate needed to borrow funds past January 31, 2004.  Thus, we conclude that interest accruing after that date on the Farm Credit loan is not deductible.

9.  <u>Conclusion</u>

We accept as reasonable the decision of the executors to implement the restructuring and to borrow funds for a short period to pay estate taxes.  However, we also conclude that the

loan was not necessary to the extent that funds were borrowed beyond January 2004, or were to be used to pay unidentified miscellaneous administration expenses or Bergreen's and Davis's compensation. Thus, the estate may deduct a portion of the interest and closing costs that accrued from October 18, 2002, to January 31, 2004; the deductible portion of the interest and costs is allocable to the portion of the loan used to pay the estate's Federal and State estate taxes.

B. <u>Whether the Estate May Deduct $3,507,723 in Additional Administration Expenses</u>

1. <u>Contentions of the Parties and Background</u>

The executors paid administration expenses of: (a) $244,074 in legal fees to Cullen & Dykman; (b) $1,556,164 in consulting fees to Price Waterhouse; (c) $633,347 in legal fees to Fensterstock & Partners; (d) $826,364 in consulting fees to Pearl Meyer; and (e) $1,247,775 in legal fees to Carter Ledyard, counsel for the estate, for a total of $4,507,723. The executors allocated those expenses to income. Respondent does not dispute that these amounts were paid to lawyers, accountants, and Pearl Meyer, or that the estate had income of $2,844,738. Respondent concedes that the estate may deduct legal expenses of $1 million that the executors paid from income.

The estate contends that it may deduct additional expenses of $3,507,723 (i.e., that much more than the $1 million respondent concedes) because those expenses are administration

expenses under section 2053 paid by or on behalf of the estate and the estate had enough income with which to pay the additional expenses.

2.    Whether the Additional Expenses Were Paid on Behalf of the Estate

Respondent contends that the additional expenses are not administration expenses because they were not paid on behalf of the estate.  The estate points out that Bergreen testified that the estate paid $4,507,723 to Cullen & Dykman, Price Waterhouse, Fensterstock & Partners, Pearl Meyer, and Carter Ledyard for necessary services provided to the estate.  The estate contends that the additional expenses were paid on its behalf.  We agree in part and disagree in part with both parties.

a.    Payments to Pearl Meyer

Bergreen's memorandum, Exhibit 48-R, states that the foundation hired Pearl Meyer.  The estate points out that it paid Pearl Meyer and contends that respondent reads Bergreen's memorandum out of context.  We disagree.

Bergreen's memorandum is consistent with the objective facts of this case, including:  (1) The New York State attorney general's office asked the foundation, not the estate, to evaluate reasonable compensation of nine foundation executives including Bergreen and Moody; (2) the Pearl Meyer findings with respect to Bergreen and Moody are based primarily on Bergreen's and Moody's activities for the businesses and the foundation, not

their duties as executors; (3) decedent's will provided that the executors were not to receive executor's fees or commissions; and (4) the payments to Pearl Meyer were made long after the restructuring.  We give more weight to these facts and to Bergreen's memorandum than to Bergreen's testimony and the fact that the estate paid Pearl Meyer.

We conclude that the $826,364 paid to Pearl Meyer was not an administration expense under section 2053.

b.  Payments to Price Waterhouse, Cullen & Dykman, Fensterstock & Partners, and Carter Ledyard

It appears from the record that the estate paid substantial administration expenses, including payments to Price Waterhouse, Cullen & Dykman, Fensterstock & Partners, and Carter Ledyard.  We accept the estate's claim that the payments to Price Waterhouse and Carter Ledyard, totaling $2,803,939, are expenses of the estate.  However, the estate failed to show that the payments to Cullen & Dykman and Fensterstock & Partners were administration expenses under section 2053; i.e., for the benefit of the estate and not for the benefit of the foundation.  The estate offered no evidence other than Bergreen's testimony on this point.  We give less weight to that testimony because of his less-than-convincing testimony regarding the Pearl Meyer expenses.  Because we believe that the estate incurred substantial expenses for necessary services provided to the estate, we allow the estate to allocate

expenses of $1,803,939 to income in addition to the $1 million that respondent has conceded.[12]

3.   Conclusion

We conclude that the estate may deduct additional administration expenses of $1,803,939 paid from income.

To reflect concessions and the foregoing,

<u>Decision will be</u>

<u>entered under Rule 155</u>.

---

[12]   We need not decide whether the estate had enough income to pay all of its deductible administration expenses from income because the amount we allow and the amount respondent concedes is less than the $2,844,738 of income respondent concedes the estate received.